[Crim. No. 959. First Appellate District, Division One.—July 12, 1921.]

## THE PEOPLE, Respondent, v. EDMUND MURPHY, Appellant.

[1] CRIMINAL LAW—RAPE—RESISTANCE—SUFFICIENCY OF EVIDENCE.— In this prosecution for rape, the evidence sufficiently shows that the prosecutrix resisted the acts of the defendant and that such resistance was overcome by force and violence.

[2] ID.—EVIDENCE—OTHER OFFENSES—CONSPIRACY.—Evidence of another crime is inadmissible, but where the evidence sufficiently establishes a conspiracy, evidence of all acts in furtherance of the common design by any or all of the conspirators is admissible.

[3] ID.—RAPE—CONSPIRACY—EVIDENCE—SIMILAR OFFENSE.—Where in a prosecution for rape it appeared from the evidence that the defendant and his companions either expressly or tacitly formed the

2. Other offenses as provable in rape, notes, 8 Ann. Cas. 459; 18 Ann. Cas. 442; Ann. Cas. 1915D, 164.

design to engage in acts of sexual intercourse with the prosecuting witness and another girl with or without their consent, proof of the attempt of the defendant and others to ·commit rape upon such other girl was admissible.

[4] ID.—CONSPIRACY—EQUAL GUILT OF CONSPIRATORS.—When a conspiracy to commit an offense of a certain class is shown, each conspirator is deemed guilty of every such crime committed in furtherance of the conspiracy by any of the conspirators.

[5] ID.—RAPE—UNCHASTITY OF PROSECUTRIX—RELEVANCY.—In a prosecution for rape evidence of the unchastity of the prosecutrix is admissible as bearing on the question of consent, but evidence of her moral delinquency is inadmissible as affecting her general credibility as a witness.

[6] ID.—FLIGHT AS EVIDENCE OF GUILT—INSTRUCTION.—An instruction in a prosecution for rape that flight itself is not evidence of guilt but is a circumstance which the jury may consider, and that it may be taken as an indication of guilt if not satisfactorily explained, is not prejudicial to the defendant in omitting the qualification as to knowledge of the defendant that he was charged with the crime, where such fact is shown by uncontradicted evidence.

[7] ID.—MISCONDUCT OF COURT—INSUFFICIENCY OF EVIDENCE.—In this prosecution for rape none of the incidents upon which the charge of misconduct on the part of the trial court is laid affords any sufficient foundation therefor.

[8] ID.—APPEAL—REVIEW OF ALLEGED MISCONDUCT—SPECIFICATION IN TRIAL COURT.—A claim of misconduct on the part of the district attorney or the trial judge will not ordinarily be considered on appeal unless the complaining party has promptly called the attention of the court to the alleged impropriety and assigned misconduct thereon.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial. Louis H. Ward, Judge. Affirmed.

The facts are stated in the opinion of the court.

Ernest B. D. Spagnoli and William F. Herron for Appellant.

U. S. Webb, Attorney-General, John H. Riordan, Deputy Attorney-General, Matthew Brady, District Attorney, and Stanislaus A. Riley, Deputy District Attorney, for Respondent.

KERRIGAN, J.—Appeal of the defendant from a judgment of conviction of the crime of rape, and from the order denying motion for new trial.

The facts of the case are substantially as stated in the brief of the attorney-general as follows: On Wednesday evening, November 24, 1920, Jessie Montgomery (whose marriage name is Matthias) was waiting on the corner of Sixteenth and Mission Streets, San Francisco, for a car to take her to her home, at 315 Fifth Street. James Carey, whom she previously had met and danced with, drove by in an automobile. After recalling himself to her he invited her and her chum, Miss Jean Stanley, into his car to be taken home. They were driven to Clark's Poolroom, on Mission Street near Twentieth, and there were joined by Thomas Brady, a friend of Carey. The four then drove in Carey's car to the Stroller's Cafe, Ninth and Folsom Streets, where each had one drink of sherry wine. Other drinks were served but they were consumed by the men; the girls did not partake of them. While the four were in the cafe defendant Murphy and Edward Kruvosky entered. There ensued a whispered conversation among the four men, the nature of which the girls do not know. But when the girls and their escorts left the premises by one door, Murphy, Kruvosky, and a third man, named Boyd, left by another door and jumped into the machine in which the four were seated. The car was driven to a shack on Howard Street and Murphy, Kruvosky, and Boyd alighted and entered the house, leaving the two girls and their escorts in the car. Upon one pretense and another Brady and Carey prevailed upon the girls to enter the Howard Street place; they were admitted by Allan MacDonald, who locked the door after them. Carey and the two girls entered a front room which was furnished with a table, chairs, and a mattress rolled up. Murphy had already gone out into the kitchen. Brady also went out into another room and returned with MacDonald, who brought in a round of drinks. The Stanley girl took none of them; the Montgomery girl took one-half of her own glass. Kruvosky in the meantime had come in from the kitchen. With Brady holding one of her hands, Kruvosky put the glass to the Montgomery girl's lips, tilted her head back, and poured the liquor down her throat. Another drink was brought in and the performance repeated.

Brady next led the Montgomery girl into the kitchen, where Murphy and Kruvosky were. Murphy demanded that she sing, and she refusing, insisted that she dance for them. Upon her refusal to dance Murphy struck her on the side of the jaw and felled her. Brady went up to her as she struggled to her feet and said: "Go on, take off your clothes and dance for them," and upon her further refusal Murphy struck her to the floor a second time. This blow was so violent that she did not know what was going on; at times she did not know anything, and at other times she knew everything that was going on but could not resist because her strength had failed her. The Montgomery girl screamed when she was hit, and the Stanley girl ran to her aid. Kruvosky hit the Stanley girl in the jaw and Murphy hit her on the face, breaking her nose. Murphy then picked her up by the hips, held her on the floor and "binged" her on the floor. Kruvosky then dragged the Montgomery girl, weakened as she was by the two fellings, into the bathroom adjoining, where he picked her up by the shoulders, threw her to the ground and knocked her head against a wash-stand, pulled her to the floor, tore her dress from off her body, rolled her around upon the floor, soiling her under-clothing, and finally ravished her. Murphy repeatedly thrust his head in the bathroom during this time and cried: "Hurry up! Hurry up!" The girl knew nothing more until she found herself on the mattress in the front room. Here Murphy and Kruvosky pulled her clothes off her in the presence of Boyd, Carey, and Brady, and here Murphy, followed by the others in turn, violated her. These acts were done without her consent and against her will after she could not resist because her strength was gone and she was absolutely powerless. She was never the wife of the defendant and had never been married to him. Carey had meanwhile led the Stanley girl into an adjoining bedroom and brought her a wet rag to bathe her bruised face. He left the room and defendant entered. Defendant demanded that she submit to him. She refused and he menacingly brandished a gun in her face. She persisted in her refusal. Defendant then picked her up and threw her on the couch and held her legs; MacDonald seized her hands and Boyd her head, while Kruvosky, coatless and with trousers un-buttoned, advanced to the attack. She struggled, begging

them to kill her rather than to torture her like that, and finally all left the room save MacDonald. The Stanley girl then got MacDonald to leave the room. She broke the window and jumped out. About this time Carey came to the door of the room, where the Montgomery girl was lying on a mattress, and cried, "Hurry up! Get your coats on, the cops are coming," and Murphy, Kruvosky, Carey, Brady, and Boyd left. The Stanley girl returned to the place with two police officers. Her face was all swollen, her eye blackened, and there was blood all over her clothes and upon her wrists. Entrance to the Howard Street premises was effected by one of the officers through the broken rear window. He opened the door for his fellow-officer and the Stanley girl. They found Jessie Montgomery lying on a mattress in the front room doubled up like a jack-knife, her face against the wall and her hands over her face; she was perfectly nude; she was in a very hysterical condition and moaning that she had been raped. Kruvosky, who had returned, was standing behind the door and MacDonald was sitting on a chair in the room. The Stanley girl dressed Miss Montgomery; the two were taken to the Central Emergency Hospital, where they were placed under the care of a physician and nurse. The doctor found the Montgomery girl's vulva to be reddened and somewhat inflamed. The girls were removed before noon that morning to the San Francisco Hospital, where a physician examined the Montgomery girl, and found her suffering from bruises over the left eye and in the temple region and considerable swelling over the malar bone, the bruises extending over on to the upper eyelid. There were bruises on the arms, mostly on the right elbow, a small discoloration on the left wrist, several bruises on the legs, the medial aspect of the right thigh just above the knee, and the left knee, on both lower legs, the tibial surfaces of the legs and several scratches on the feet.

On Friday, November 26th, or Saturday, November 27th, Detective Sergeant Jackson, Detective Dorman, and Officer Darling went to defendant's residence to apprehend him, but received no answer to their ringing of the doorbell. Defendant was not apprehended until Tuesday, November 30th, though the police had constantly been looking for him since midnight of the 25th. The house in which he was

finally located was covered by the police, two of whom rang the bell and knocked on the door of the premises. They received no response and broke in the door. Defendant ran out and was captured on the roof of an adjoining building. He admitted to the police officers that he was trying to escape and that he had been hiding since the night of the 25th. Subsequently the defendant and Carey were brought before the girls at the San Francisco Hospital. There Miss Montgomery twice accused the defendant of having raped her. Once he denied it. The second time he stood mute. En route from the hospital to the Hall of Justice, while defendant and Carey were in the police automobile, there ensued a conversation between Carey and the defendant wherein Carey commented on the fact that Miss Stanley had noticed his diamonds, and that she did not look to be twenty-one years old. He further remarked, "Those blondes are my jinx. The last time I got in trouble a blonde got me into that too," to which the defendant rejoined, "She is a fighting bitch all right." Later the defendant declared that the Montgomery girl came prepared for what she got, and that she got it.

[1] The first ground urged by the appellant in support of his appeal is that the evidence is insufficient to sustain the verdict in that it fails to show that Jessie Montgomery, the prosecuting witness, resisted any of the acts of the defendant, or that her resistance was overcome by force, or that she was in such a condition that she could not have resisted. In this behalf it appears from the evidence offered on behalf of the people, as already outlined, that because she refused to remove her clothes and sing and dance for the defendant and his companions and persisted in such refusal the defendant struck her on the head, knocking her down twice; that after the second blow she was unable to get up, whereupon Kruvosky dragged her into the bathroom, threw her down, hitting her on the head, pulled off her dress, rolled her on the floor, and finally had sexual intercourse with her. During this time the defendant every once in a while would stick his head in the room and say, "Hurry up! Hurry up!" and that the girl knew nothing after Kruvosky had ravished her until she found herself on the mattress in the front room. Here the defendant and Kruvosky pulled her remaining clothes off, and the former

engaged in an act of sexual intercourse with her. This evidence is ample to show that the prosecutrix did resist, and that her resistance was overcome by force and violence. It is to be noted that the defendant and Kruvosky had been following professional boxing as an occupation, and that their victim was a girl seventeen years of age. Immediately before her rape by the defendant she had been subjected to the most brutal treatment, rendering her unconscious, and only came to a moment before the attack which it is now insisted that she did not sufficiently resist. She herself testified, ''I could not resist because my strength was all gone. I had absolutely no strength left.'' It is not claimed by the defendant's counsel that she consented or was a willing victim; and it is hardly to be expected that a person upon whom had just been inflicted a brutal bodily attack could offer a more strenuous physical resistance, the degree of which must necessarily depend upon the circumstances surrounding the act at the time and the relative strength of the persons concerned. It is a just inference from the evidence that Jessie Montgomery resisted to the full extent of her capacity. (*People* v. *Bonanzi,* 24 Cal. App. 549, [141 Pac. 1062].)

Complaint is also made of the ruling of the court in admitting the testimony of Jean Stanley, over the defendant's objection, to the effect that the defendant and other persons attempted to commit rape upon her, in doing which the defendant threw her on a couch and held a gun in her face, threatening to kill her unless she would submit to an act of sexual intercourse. The argument is that this was evidence of a wholly distinct and collateral offense, involving a different person and wholly irrelevant to the charge.

[2] It is, of course, the general rule that evidence of another crime is inadmissible, but where, as here, the evidence sufficiently established a conspiracy, evidence of all acts in furtherance of the common design by any or all of the conspirators is admissible. [3] From the statement of the facts already given, enough appears to show that the defendant and his companions either expressly or tacitly formed the design to engage in acts of sexual intercourse with the prosecutrix and Jean Stanley either with or without their consent. It is a fair inference from the conduct of the defendant and his codefendant that such a design

was formed at the Stroller's Cafe. Reference has already been made to the whispered conversation out of the hearing of the two young women, to their leaving the cafe together, joining Carey and Brady immediately outside, and then riding with them and their intended victims to the Howard Street shack. Here the girls and their original escorts entered by one door, while the defendant and Kruvosky entered by another, and shortly after they were all in the building they came together and proceeded jointly and severally with the attacks described, which appear to have been well understood and designed. [4] The established rule is that when a conspiracy to commit an offense of a certain class is shown each conspirator is deemed guilty of every such crime committed in furtherance of the conspiracy by any of the conspirators. (*People* v. *Eldridge,* 147 Cal. 782, [82 Pac. 442]; *People* v. *Schmidt,* 33 Cal. App. 426, [165 Pac. 555]; *People* v. *Ciulla,* 44 Cal. App. 719, [187 Pac. 46].)

[5] The defendant assigns as error on the part of the trial court the giving of certain instructions to the jury, the first of which reads as follows: "You are further instructed that the moral delinquency of the girl complainant, if there be any such moral delinquency, is not to be considered by you as affecting her credibility." In this state in cases of this character the rule is that evidence of the unchastity of the prosecutrix is admissible as bearing on the question of consent, but evidence of her moral delinquency is inadmissible as affecting her general credibility as a witness. (*People* v. *Johnson,* 106 Cal. 289, 294, [39 Pac. 622]; *People* v. *Harlan,* 133 Cal. 16, [65 Pac. 9]; *People* v. *Welmot,* 139 Cal. 103, 107, [72 Pac. 838].) However, in this case no evidence was introduced for either purpose, and while, therefore, we are unable to lend our concurrence to the giving of this instruction, still we do not believe, when the instructions are read in their entirety, including those charging the jury in various forms that they were the sole judges of the weight and value of evidence and of the credibility of the witnesses, that the jury could have believed that they were not at liberty to consider the conduct of the prosecutrix on the night of the offense or during the trial as affecting the value and weight of her evidence.

[6]   The second of such instructions is one on the subject of flight, and was in the following language: "I instruct you that flight itself is not evidence of guilt but is a circumstance which you may consider in determining the issues in the case; and if there is any explanation of the flight, if there was any evidence of flight, you can take such explanation into consideration; and unless you are convinced that the explanation is satisfactory to you, you may take such evidence of flight as an indication of guilt." The defendant argues that this instruction omits the essential qualification that in order to make flight indicative of a guilty conscience the defendant must know that he is charged with crime. The evidence clearly shows without conflict that the defendant knew that he was charged with the crime and that he tried to escape, therefore it is not considered that the defendant was in any manner prejudiced by the instruction.

The appellant also seeks a reversal of the judgment on the ground of alleged misconduct of the court during the course of the trial.

On one occasion during the direct examination of the prosecutrix the trial judge, over the defendant's objection, propounded leading questions to her. The witness had already testified "Kruvosky used me," and it was to remove any ambiguity from this expression that the suggestive questions were asked, the court remarking in response to the objection: "I have a lady on the stand, and she has already indicated that she is embarrassed by telling a story of this kind. . . . I am using my discretion, because it seems to me that this lady cannot tell the story without these questions being propounded to her." The action of the court, it is clear, is subject to no unfavorable criticism.

Again, during the cross-examination of this witness counsel for the defendant claimed that she hesitated in answering one of his questions, and he requested that the record show that she hesitated; upon which the court remarked that she had not hesitated; and a few minutes later after discussion, the court said: "That is a matter of argument. Some people hesitate so they may be sure." The witness had testified that she had identified the defendant three or four days after the assault, and she was then asked if she would not swear that it was not five days afterward. It

was as to the last questions that the defendant claims the
witness hesitated.  We cannot conceive upon what ground
the defendant's counsel desired that the record should show
the alleged hesitation, since the fact, if it existed, was be-
fore the jury; and its record, if one were made, would be
useless to the court for whose benefit the record is prepared,
since the length of time taken by a witness to consider what
answer he should give to a question would not aid this court
in deciding the questions of law presented to it upon an
appeal; nor can we understand how the remark of the court,
that persons sometimes hesitate in order to be sure—which
is an obvious fact—prejudiced the defendant.  It does not
appear that the court was making an unfair comment upon
the evidence, nor, as further claimed, that the remarks of
the court were designed to enhance the credibility of the
witness.

At another point in the cross-examination of the same
witness counsel for defendant during a discussion of a ques-
tion propounded by him was told by the court that he was
on a "fishing excursion."  This expression, often encoun-
tered in *nisi prius* trials, described accurately what defend-
ant's counsel was engaged in.  It was not used offensively,
and the employment of the expression, while it might jar
the sensibilities of counsel, is far from constituting miscon-
duct, it not appearing that the defendant's rights were in
some way prejudiced thereby.  (*People* v. *MacDonald,* 167
Cal. 545, [140 Pac. 256].)

The next complaint is that the court declared two answers
of this witness to amount to the same statement.  At one
place in her cross-examination the witness, respecting the
identification of the defendant at the hospital where she and
her companion were being treated, said that after the de-
fendants had left the room she remarked (referring to Miss
Stanley), "Well, I didn't hear her say anything about
Murphy."  A few moments later she revised her testimony
in this particular, and said that Miss Stanley had identified
the defendant at the hospital as one of the men who had
treated her so roughly in the Howard Street shack.  In a
discussion upon the subject the court remarked, "It is the
same statement."

In this respect the court was in error, but it amounted to
nothing, for right then and there it was in effect conceded

that the two answers were at variance, and the witness explained it by saying that when she first answered the question she had not recollected what had been said by Miss Stanley, but that a moment later, her memory being refreshed, she corrected her testimony. Statements by the court like this, if they exercise any influence upon the jury, help rather than hurt the defendant.

Counsel for the defendant states that one of the worst instances of misconduct on the part of the court occurred during the cross-examination of Miss Stanley. It had been shown that both of the young women, a few days after the occurrences at the shack, had identified the brother of defendant, K. O. Kruvosky, known in the record as "Bevo" Kruvosky, as one of their assailants, and had afterward admitted that they were mistaken in such identification. The part of the cross-examination in respect to which it is claimed that the court was guilty of misconduct is as follows:

"Q. Did you identify anyone as a party who was in this Howard Street house upon this night and subsequently say that your identification was wrong?    A. Yes.

"Q. Please relate that.

"The Court: Q. Who was it that you identified, Miss Stanley?

"A. K. O. Kruvosky.

"Mr. Spagnoli: Q. You identified K. O. Kruvosky and you made a mistake; is that correct?

"A. Edward Kruvosky's brother.

"Q. I don't know who his brother is. Will you tell me his name?    A. I don't know his first name.

"Q. Now, do you mean to tell me you misidentified K. O. Kruvosky, is that the idea?

"The Court: Now, I am going to have this witness informed on that matter. I think she is entitled to it. The court knows from questions you have propounded to other witnesses here to-day that the man you have in mind is Bevo Kruvosky.

"Mr. Spagnoli: I have no one in mind, if your Honor please.

"The Court: I am not going to have this witness confused.

"Mr. Spagnoli: I don't know who this witness misidentified.

"The Court: Q. Do you know the man who is in custody now, Kruvosky, Miss Stanley?

"A. Yes, I do.

"Q. Is that the man you identified and subsequently said he was not the man?     A. No.

"Q. Who is the man?     A. It is Bevo Kruvosky."

By this excerpt from the record the witness appeared to be laboring under no confusion and needed no assistance or protection; but in any event her misidentification of one of the defendants lost none of its force, it is clear, by the action of the court.

Nor does it appear from the record, as claimed by the defendant, that his right of cross-examination of this witness was unduly curtailed. At one place in the cross-examination it does appear that counsel stated that he was taken by surprise as to a portion of the testimony of Miss Stanley; that he was tired from the long day and night sessions of the court, and asked permission to finish the cross-examination of the witness at another time. This request was denied, and he was asked if he had any further questions, to which he replied: "We have nothing further at this time." It does not appear on what subject he wished to further cross-examine her, nor did he subsequently recall this witness for further cross-examination, as the court intimated might be done upon a proper showing. We do not think that the defendant's complaint of undue curtailment of cross-examination can be predicated upon this state of the record.

Complaint is next made that the court refused defendant a continuance in order to enable him to prepare for the cross-examination of Corporal Suttmann, a witness for the people. At the conclusion of the direct testimony of this witness, defendant's counsel, addressing the court, said that he had been taken by surprise, and that he desired an opportunity to consult with his client before cross-examining the witness. The court permitted the witness to be withdrawn, and two other witnesses for the prosecution were called and examined, which concluded the case for the people with the exception of one professional witness who would, it was said, be in court the following morning. Thereupon the court directed counsel for the defendant to commence the defense, or proceed with the cross-examination of Suttmann. Defendant declined to proceed with his de-

fense until the case for the people was closed, and insisted that under all the circumstances of the case and the lateness of the hour he should not be required to proceed with the cross-examination of Suttmann until the next day. The court finally accorded counsel for the defendant ten minutes to consult his client, after which the cross-examination was taken up. There is no showing that the defendant was prejudiced in his defense by the refusal to grant further delay.

Finally, the defendant complains of the refusal of the trial court to grant a continuance under the following circumstances: Having examined several witnesses his counsel desired to place upon the witness-stand three others who, although subpoenaed, were not present in court. Two other of defendant's witnesses, however, were present, upon which showing the court refused defendant's request for a continuance, the sole ground of which apparently was his desire to examine his witnesses in a prearranged order, and he was given one minute in which to place his next witness upon the stand. He thereupon took the stand as a witness in his own behalf. Later, two of these three witnesses appeared in court and were examined. They both testified that although they lived near the Howard Street shack they heard no screaming or outcry upon the night of the occurrences upon which the present charge is based. The third witness did not appear and could not be produced; but upon counsel stating that he expected to prove by her that she had not heard any screams or outcry or noise of women on the night in question, the district attorney offered to stipulate that this witness if produced would so testify, but counsel for the defendant replied, "We don't want any admissions. We want to prove it by the witness."

It does not appear that the refusal to postpone the case deprived the defendant of the benefit of any testimony, or that the disarrangement of the order planned for the calling of his witnesses resulted in any prejudice to the rights of the defendant. At the time of the requested continuance the court had been in session only a little over an hour. And here, as in many instances throughout the trial, it appears clear that the defendant sought to delay the progress of the trial without any very good reason in law therefor. The remarks of the court hereinabove referred to are

typical of a number of others now claimed as misconduct for the first time in appellant's reply brief.

[7] None of the incidents, or all of them, upon which the charge of misconduct on the part of the trial court is laid, afford any sufficient foundation therefor; and this was probably the view taken by the defense at the time, for no assignment of error with respect to them was then made. [8] It has long been the rule in this court that a claim of misconduct on the part of the district attorney or the trial judge will not ordinarily be considered on appeal unless the complaining party has promptly called the attention of the court to the alleged impropriety and assigned misconduct thereon. The reason for this rule is that the court should be given the opportunity to correct the irregularity or to prevent any prejudicial effect if that be possible. (*People* v. *MacDonald,* 167 Cal. 545, 551, [140 Pac. 256].) Much of the trouble during the trial between the court and counsel for the defendant was occasioned by the manifest desire of the court on the one hand to expedite the trial of the defendant as much as possible, and by counsel on the other hand to gain delay, claiming at times that by reason of the long night and day sessions of the court that he was exhausted and at other times that he had not had sufficient opportunity to prepare for the direct and cross examination of witnesses or to prepare proposed instructions for the jury. But assuming, as earnestly urged, that the court was impatient and frequently unjustly rebuked counsel, still it is quite certain that we cannot hold as claimed that the court was hostile to counsel and the defense and that the attitude of the court toward both was such as resulted in an unfair trial to the defendant.

No further questions are presented.

Judgment and order are affirmed.

Waste, P. J., and Richards, J., concurred.

A petition to have the cause heard in the supreme court, after judgment by the district court of appeal, was denied by the supreme court on September 8, 1921.

All the Justices concurred.