[Civ. No. 14285. First Dist., Div. One. Sept. 15, 1950.]

JOSEPH GERM, Respondent, v. CITY AND COUNTY OF SAN FRANCISCO, Appellant.

Dion R. Holm, City Attorney, and George E. Baglin, Deputy City Attorney, for Appellant.

John Wynne Herron for Respondent.

BRAY, J.—In an action for personal injuries, a jury verdict was rendered against plaintiff in favor of defendant Yellow Cab Company and its driver, Albert A. Brodose, and in favor of plaintiff against the City and County of San Francisco* in the sum of $63,044.20. From the judgment thereon the city appealed.

### Questions Presented

1. Alleged insufficiency of the evidence. 2. Alleged error in instructions. 3. Was the claim presented by plaintiff to the city a verified one? Alleged error in exclusion of testimony

---

*Hereinafter referred to as "the city."

concerning it. 4. Alleged misconduct of the trial judge. 5. Alleged error in exclusion and admission of testimony. 6. Alleged error in misconduct of a juror. 7. Alleged misconduct of counsel for Yellow Cab Company. 8. Alleged excessive damages.

### FACTS

On a dark Sunday evening about 9:30, at a point on Mission Street in San Francisco south of 15th Street, plaintiff was struck by a cab of defendant Yellow Cab Company, driven by defendant Brodose. Plaintiff and defendants Yellow Cab Company and Brodose claimed that the cab had stopped near plaintiff and that the city's streetcar negligently struck the cab, pushing it into plaintiff. The city's theory was that the streetcar mildly bumped into the taxi after it had already run into plaintiff and inflicted his injuries. The accident happened in 1945. The trial was not had until four years afterward. The evidence was highly conflicting. While the city has meticulously combed the evidence and pointed out many facts supporting its theory, including contradictory statements by some of plaintiff's witnesses, still, taking the evidence and the inferences reasonably deducible therefrom most strongly in favor of plaintiff, as we are required to do, the evidence is sufficient to support the verdict. This evidence follows:

Plaintiff, an unemployed laborer 50 years old, walked from the east side of Mission Street out to the safety zone for streetcar passengers boarding northbound cars at 15th Street. He saw a streetcar coming from the south, from 16th Street, and a Yellow Cab which was about 80 feet away when he left the curb. The cab swerved to a stop facing plaintiff where he was standing at the end (south) of the zone between two of the three raised markers; the front of the cab was at a "V" painted on the street preceding the zone. The cab was at a slight angle to the southbound tracks, with its left rear fender about a foot from the nearest rail. Plaintiff and the cab remained stopped for from 15 to 20 seconds, when the streetcar came on down the block and struck the cab with great force, pushing it into plaintiff, who was thrown 5 feet into the air, landed on the hood of the cab, and then rolled off under the cab. The cab driver held his brakes and was pushed along for several feet, and then his foot was knocked off the brake. The streetcar pushed the cab to within 15 feet of the south crosswalk of 15th Street. Skid marks were left on the

pavement where the cab had been pushed, that of the left rear tire being about 40 feet long, and parallel to the tracks for a little distance, then swerved over the tracks and that of the right wheel being about 15 feet long and turning toward the rails and passing over two of the raised safety zone markers.

## 1. SUFFICIENCY OF EVIDENCE

 It is not necessary to detail the evidence given by the various witnesses. While there is strong evidence to support the city's contentions, the testimony of plaintiff, Brodose, Serenia Murphy, Cecil B. Murphy, and Ross Williams, if believed (and it evidently was), was sufficient to support the verdict.

The city contends that certain physical facts conclusively support its contention that the cab had already hit plaintiff before the car arrived. This contention is based upon the assumption that its interpretation of these facts is the only possible one, and upon the conclusion that the jury must necessarily believe its witnesses. For example, its interpretation placed upon the location of the skid marks is not the only reasonable one deducible therefrom; also, it was for the jury to determine the credibility of the city's employees who testified that the damage to the streetcar was extremely slight. In this latter behalf it is significant that while the city produced photographs of the damaged cab it did not produce any of the condition of the streetcar. The city characterizes the injury to the rear of the cab as slight. However, from an examination of the photographs the jury could very well find that the damage was considerable and must have been caused by more than slight force. After an examination of all the evidence, we cannot say that there is any undisputed physical fact which refutes the positive testimony of plaintiff's eyewitnesses to the accident.

## 2. INSTRUCTIONS

 Among the instructions given were two which for convenience we have lettered (a) and (b).

(a) "You are hereby instructed that it is the duty of the streetcar operator to anticipate that he might have obstructions, such as a stopped motor vehicle, in his path, and he must keep a proper lookout and keep his streetcar under such control as will enable him to avoid a collision with such stopped motor vehicle, and if the situation requires it, he must slow up

and stop. A failure, if any, on his part, to use this car[e] to avoid such a collision, is negligence.''

(b) ''You are instructed that the operator of a streetcar has no right to assume that a street is clear or will remain clear, but he must anticipate and expect the presence of others, including motor vehicles and pedestrians, lawfully using such street. Accordingly, the fact, if it be a fact, that the operator of a streetcar did not know that a pedestrian was on the street, is no excuse for conduct which would have amounted to recklessness if he had known that a pedestrian was on such street.''

These instructions are patterned after instructions approved in *Meyers* v. *Bradford,* 54 Cal.App. 157 [201 P. 471], which was an action involving a collision between two automobiles. The instructions in the Meyers case have been variously criticized and explained. For example, in *Anderson* v. *Freis,* 61 Cal.App.2d 159 [142 P.2d 330], the court considered a similar instruction and found it ambiguous, but as was done in other cases, held that there was no prejudice in giving it as the subject of negligence was fully covered in the other instructions. As to instruction (a), a similar instruction was refused in *Blythe* v. *City & County of S. F.,* 83 Cal.App.2d 125 [188 P.2d 40], which was a case involving a collision between a streetcar and an auto stalled on the tracks. The instruction there read: ''You are instructed that it was the duty of the motorman in operating the streetcar down the hill toward the corner where this accident occurred, to keep his streetcar in such control as would enable him to stop at any time to avoid injury to persons or property lawfully upon the highway, and if the motorman failed in this duty then the defendant, City and County of San Francisco, was guilty of negligence.'' This court said: ''The proffered instruction was properly refused because it does not correctly state the law. It was not the legal duty of the motorman to operate and control his streetcar so as to 'enable him to stop at any time to avoid injury to persons or property lawfully upon the highway.' If such were the law it would be the duty of a motorman, proceeding carefully, to stop regardless of the time at which the person or property came upon the tracks. Negligence cannot be based upon such an exacting formula completely divorced from the variables of time, place and surrounding circumstances.'' (P. 135.)

Instruction (a) should not be given without modification in an action involving a streetcar accident. Instruction (b),

likewise, should not be given in this type of action, as, standing alone, it implies that a motorman, whether he sees a pedestrian on the street, or whether he does not see him, is reckless if he fails to anticipate that the pedestrian might step on to the car tracks. The giving of these instructions was erroneous.

But, under the circumstances of this case, and in view of the provisions of section 4½ of article VI of the Constitution, we cannot say that it was prejudicial. All of the instructions must be considered together and no one or two considered as an isolated whole. (*Blackmore* v. *Brennan,* 43 Cal.App.2d 280, 287 [110 P.2d 723].) The court further instructed: ''In the absence of knowledge or reason to know to the contrary, the motorman of a streetcar, so long as he is exercising ordinary care, may operate his streetcar forward on the assumption that the driver of an automobile which is traveling in front of the streetcar and in the same direction, will not suddenly stop his automobile on the streetcar track so close to the on-coming streetcar as not to afford the motorman a reasonable opportunity to stop.'' ''If you find that the plaintiff in this action, by a failure to exercise reasonable care, caused the taxicab suddenly to stop near the streetcar tracks, and thereafter negligently blocked the passage of the taxicab and the streetcar, and as a proximate result of such conduct on his part the accident occurred, the plaintiff cannot recover in this action.'' ''The operator of a streetcar is only obliged to exercise ordinary care and caution in the operation of the car to avoid inflicting injury upon persons on the street.'' Under the evidence, the jury had to decide which of the witnesses it was going to believe: those who testified in support of plaintiff's contention that the cab stopped to permit him to cross to the safety zone and that such a time elapsed between the stopping of the cab that the motorman saw or should have seen it in time to avoid striking it, and yet the car struck the cab knocking it into plaintiff; or those who testified that the cab hit the plaintiff before the car struck the cab. In view of the instructions as a whole and these issues raised by the evidence, it is difficult to see how the jury could have been misled by instructions (a) and (b). The jury was positively instructed that the motorman was obliged to use only ordinary care. If it believed the city's witnesses, he had done so; if it believed plaintiff's and the cab company's witnesses, he had not done so.

Many of the city's objections to these instructions are based upon the claim that they ignore or do not incorporate

the city's version of the facts. Thus, the city contends that the instructions assume that the streetcar struck the cab before the latter hit plaintiff. Of course, the court is required to instruct on the theories of both parties rather than on that of one party alone. It is true that the motorman testified that he saw plaintiff on the street. However, the jury did not necessarily have to believe him; hence the city's contention that an instruction on the motorman's failure to see plaintiff should not have been given, is not well founded.

■ The city contends that two of the instructions on intoxication were erroneous. It was the city's theory that plaintiff was intoxicated and by reason of that fact walked into the path of the oncoming cab, causing it to get into the path of the oncoming car. The theory of plaintiff and defendants Yellow Cab Company and Brodose was that plaintiff was standing in the safety zone, and hence, although they claim plaintiff was sober, it was immaterial whether he was intoxicated. The first instruction was to the effect that it is not illegal and does not constitute negligence *per se* for a person to take drinks of an alcoholic nature. The second instruction was to the effect that if plaintiff was standing within the safety zone when struck, and if plaintiff was free from contributory negligence, and if the defendants or any of them were guilty of negligence which proximately caused plaintiff's injuries, then the question of whether or not plaintiff had been drinking was immaterial. Plaintiff was entitled to have instructions given on his theory of the case. These two instructions were only a part of the instructions given on intoxication. Among these were instructions to the effect that the jury might consider intoxication of plaintiff, if proved; that intoxication is no excuse for failure to act as a reasonably prudent person would; that an intoxicated person is held to the same standard of care for his own safety as a sober person; and that if intoxication prevented plaintiff from acting as a reasonably prudent person would and as a proximate result thereof he was injured, he could not recover. These instructions properly stated the law and were not erroneous.

### 3. PLAINTIFF'S CLAIM

■ The San Francisco charter requires, as the foundation for an action of this kind against the city, that a claim be presented and that such claim be verified. (Stats. 1935, p. 2421, § 87.) Plaintiff alleged in his complaint that he had filed such a claim. This allegation was denied by the city.

At the trial, the original claim presented to the city was offered in evidence by plaintiff and admitted without objection by the city. On its face it appeared to be signed by plaintiff and verified by his oath before notary public Marie H. Stanley. The city called Mrs. Stanley as a witness. She testified, in effect, that she had no recollection of going to the San Francisco Hospital where admittedly plaintiff was confined on the day the claim was verified, but that either she did go there, or that plaintiff's then attorney brought the claim to her already signed and informed her that the signature was plaintiff's; that she frequently verified documents presented to her by attorneys under similar circumstances. Before Mrs. Stanley testified, the city attempted to show through plaintiff that he had not signed the claim in the presence of the notary. After some questions of plaintiff, the court refused to permit the city to examine him any further on the subject. Thereupon the city made an offer to prove through plaintiff that the claim was brought to plaintiff at the hospital by his then attorney, signed by plaintiff, and that plaintiff at no time appeared before the notary to verify it. The court refused to permit the city to make such proof. Thereafter the court refused to give the jury an instruction offered by the city to the effect that if plaintiff did not appear before the notary and personally verify the claim, it would not be a verified claim as required by the charter, and its verdict must be in favor of the city.

Was the claim a verified one? For the purposes of this discussion we will assume, as contended by the city, that plaintiff did not personally verify it, but that he signed it, and the notary verified it on the assurance of plaintiff's attorney that the signature was that of plaintiff. We will also disregard the fact that the city made no objection to its introduction in evidence. "The chief purpose of the claim requirement is to enable the city to make an investigation of the claim and give it an opportunity to settle without litigation." (*Holm* v. *City of San Diego,* 35 Cal.2d 399, 400-401 [217 P.2d 972].) Undoubtedly the requirement that the claim be verified is to hold the claimant responsible for false statements made in the claim. Section 121 of the Penal Code provides: "It is no defense to a prosecution for perjury that the oath was administered or taken in an irregular manner, or that the person accused of perjury did not go before, or was not in the presence of, the officer purporting to administer the oath, if such

accused caused or procured such officer to certify that the oath had been taken or administered.'' (See *People* v. *Darcy,* 59 Cal.App.2d 342 [139 P.2d 118].) ''In determining whether or not there has been substantial compliance the purpose of the claim statute is important.'' (*Knight* v. *City of Los Angeles,* 26 Cal.2d 764, 767 [160 P.2d 779].) The claim here satisfied both purposes of the claim statute, namely, the city was enabled to make a full investigation of the claim and had an opportunity to settle had it been so advised, and secondly, the verification was sufficient to support a perjury charge were any false matters stated therein. While it is true, as stated in 1 California Jurisprudence, page 667, and in *In re Johnston,* 220 F. 218 (cited by the city), that the notary's jurat is not conclusive, nevertheless the use by the subscriber of the document as a verified one constitutes a substantial compliance with the requirement that the document be verified. In *Le Mesnager* v. *Hamilton,* 101 Cal. 532 [35 P. 1054, 40 Am.St.Rep. 81], it was held that a married woman could not be bound by an acknowledgment of a mortgage when she never in fact appeared before the notary making the acknowledgment, and that it was error to refuse evidence to prove the true facts. However, at that time there was a specific requirement that a married woman must appear personally before the notary, so that there could be no question that she was acting voluntarily. Moreover, at that time the courts were extremely technical in all matters respecting conveyances of property. In *Fairbanks, Morse & Co.* v. *Getchell,* 13 Cal.App. 458 [110 P. 331], it was held that an oath given over the telephone to a notary was invalid, but mainly on the ground that the person at the other end of the telephone was in a county other than that of the notary, and hence was out of the notary's jurisdiction. The courts in late years have liberalized their attitude towards claims required to be filed with municipalities. Thus, in *Kelso* v. *Board of Education,* 42 Cal.App.2d 415 [109 P.2d 29], the court held that a claim for injury to the son substantially complied with the statute although verified by the father. In *Holm* v. *City of San Diego, supra* (35 Cal.2d 399), it was held that a claim which did not state the address of the claimant (a factor previously considered essential (*Holm* v. *City of San Diego,* *(Cal.App.) 208 P.2d 777)), substantially complied with the statute.

---

*A hearing by the Supreme Court was granted on Sept. 26, 1949, and the final opinion is reported in 35 Cal.2d 399, 217 P.2d 972.

While there are circumstances under which, to constitute a verification to an instrument, the subscriber must personally appear before the notary, it would be the height of technicality, serving no good purpose, to hold that the claim here did not constitute a substantial compliance with the requirement that it be verified. Therefore there was no error in the court's refusing to permit the city to produce evidence on the subject.

#### 4. ALLEGED MISCONDUCT OF JUDGE

The city has made nine assignments of alleged misconduct by the trial judge. We have examined all of these incidents. Some of them were comments on the evidence by the court; others were in connection with rulings on the admission or exclusion of evidence. We do not deem it necessary to detail the incidents here. As to the comments on the evidence, they were either legitimate comments by the court, or, where erroneous, such as the intimation that a certain witness' testimony was not impeached by his deposition, were fully cured by the court's repeated statements that the jury was the sole judge of the evidence and the credibility of the witnesses. In some of these instances the judge made erroneous statements of the law, but in every instance the error was cured by permitting the city to proceed as the judge had previously stated it could not proceed. For example, the judge stated that a certain witness could not be cross-examined from his unsigned deposition, and then permitted the city to so examine him. In some of the instances the judge spoke heatedly, was discourteous, intemperate, and failed to exhibit that judicial demeanor expected of judges. As said in the Canons of Judicial Ethics of the Conference of California Judges, ''A judge should be temperate . . . courteous . . . a judge's attitute should not reflect undue impatience or severity toward either counsel . . .'' (Canons 5, 6 and 13.)

Taking these actions of the judge as a whole, it must be said that he should have displayed a more judicial temperament, but we cannot say that his outbursts prejudicially affected the case, particularly as the judge was somewhat impartial in the distribution between counsel of like, testy remarks. On occasions he was equally harsh and intemperate with the other counsel in the case, in one instance, resulting in an assignment by the cab company's counsel of misconduct by the judge. It must be pointed out that in no instance did the city's counsel make an assignment of misconduct at the trial. It frequently has been held that this failure prevents con-

sideration of the matter on appeal. (*Jones* v. *Bridges*, 38 Cal.App.2d 341 [101 P.2d 91]; *Jones* v. *Bayley*, 49 Cal.App.2d 647 [122 P.2d 293]; *People* v. *MacDonald*, 167 Cal. 545 [140 P. 256].) It is the city's contention that the conduct of the judge as a whole and in part brings the case within the rule that where the misconduct is such that admonitions by the judge to the jury to disregard it could not repair the damage, no such assignment need be made. (*People* v. *Walker*, 93 Cal. App.2d 818 [209 P.2d 834].) For that reason we have examined the incidents in detail. In number, the city's counsel bore the brunt of this petulance more often than other counsel. However, counsel's conduct in extending the trial by unduly lengthy and repetitious cross-examination of the witnesses contributed somewhat to the situation. The city's tendency to emphasize quantity rather than quality has extended itself even to its briefs on this appeal. They total 385 pages in length. Its reply brief of 127 pages is primarily a repetition of the matters set out extensively in its opening brief. The statement in *People* v. *Murphy*, 53 Cal.App. 474, 487 [200 P. 484], is appropriate here: "Much of the trouble during the trial between the court and counsel for the defendant was occasioned by the manifest desire of the court on the one hand to expedite the trial of the defendant as much as possible, and by counsel on the other hand to gain delay. . . ." We are not condoning the petulance and actions of the judge, but an examination of the entire record convinces us that it did not deprive the city of a fair trial, particularly in view of the fact that lightning did not strike the city alone, and that time after time the court admonished the jury that regardless of what it said the jury should disregard its statements and was the sole judge of the facts and the veracity of the witnesses.

## 5. EXCLUSION AND ADMISSION OF TESTIMONY

Counsel for the city was examining Police Officer Peyre on direct examination concerning a conversation at the scene of the accident with defendant Brodose. "Q. And did Mr. Brodose tell you where the plaintiff was with respect to his taxicab when he, Brodose, first saw him?" The court sustained an objection to this question as leading and suggestive, and in doing so remarked that a member of the police department of San Francisco is presumed to have passed a civil service examination that required some intelligence and therefore he did not need assistance by leading questions. Any

error in the ruling and in the court's improper statement was cured by the fact that counsel was thereafter permitted to go thoroughly into the conversation and to use the same form of question.

Later, on direct examination, counsel for the city asked Peyre this question: "Did this man [a witness to the accident] tell you that he saw the injured man standing there and the cab was standing there, then the streetcar hit the cab and pushed it into the man?" An objection that the question was leading and suggestive was sustained, as was an objection to the following question, on the same ground: "Did he tell you the accident happened in this fashion: That the man, the injured man that was standing there and the cab was standing there, and then the streetcar came up ten seconds later and pushed the cab—yes, pushed the cab into the man?" Both questions were based almost verbatim on what Williams, the witness, had testified he told the police officer. While these were proper questions, no harm was caused by the ruling, for the subject was completely covered in subsequent questions.

The city called Nils Wiseth in rebuttal to testify what plaintiff told him about the accident. After asking the witness what was said in the conversation referred to; and receiving an answer, counsel asked if plaintiff told the witness he was standing in a safety zone and the taxi came up to within 5 feet of him and he stood there 15 or 20 seconds. The court sustained an objection to this as leading and suggestive, which it unquestionably was. The witness was the city's witness on direct examination. Moreover, at the end of the discussion between court and counsel for plaintiff and counsel for the city, the latter withdrew the question.

*Refusal to Permit Kennedy to Testify.*

Kennedy, the investigator for the cab company, arrived at the scene of the accident shortly after it occurred. Brodose testified he told Kennedy what had happened. Kennedy shortly after the accident interviewed Mrs. Murphy, taking a statement from her, which she signed. She testified that Kennedy suggested to her the number of feet that the car stopped south of 15th Street, as she was not a good judge of distance. Kennedy was in court during the trial. The usual order excluding all witnesses was made at the beginning of the trial at the request of the city. A little more than halfway in the trial of the case, the city called Kennedy to the stand.

Thereupon counsel for the cab company objected to his being sworn as a witness on the ground that he had sat in court during the trial up to that point, to the city counsel's knowledge, and that his presence in court in violation of the rule of exclusion made him incompetent as a witness. The court sustained the objection and refused to allow Kennedy to be sworn, solely on that ground. This undoubtedly was error. (*People* v. *Russell*, 34 Cal.App.2d 665 [94 P.2d 400]; *People* v. *Talkington*, 8 Cal.App.2d 75 [47 P.2d 368]; *People* v. *Mack*, 115 Cal.App. 588 [2 P.2d 209]; *People* v. *Boscovitch*, 20 Cal. 436; *Mintzer* v. *Wilson*, 21 Cal.App.2d 85 [68 P.2d 370].) But was it prejudicial under the circumstances of this case? The city made no offer of proof, but "Where the trial court erroneously refuses to permit a witness to take the stand or be sworn to testify under any circumstances or upon any subject without regard to the question of the admissibility or relevancy of the evidence the witness might give, basing its refusal on the ground that the witness is wholly incompetent to testify, *and it can be ascertained from the record that the witnesses' testimony would be vital,* no offer of proof is necessary to establish that such error was prejudicial." (*People* v. *Duane,* 21 Cal.2d 71, 81-2 [130 P.2d 123]; emphasis added.) Thus, to be prejudicial, it must appear to this court that the testimony which the witness would have given was vital. Obviously, if it was not or would not have been admissible, then the city has not been damaged by its exclusion.

The city at no place in its briefs, in spite of their great length, has set forth what it expected to *prove* by Kennedy. It does set forth what it would have *examined* him about, but in nowise intimates what it expected he would testify. It seems to assume that because Kennedy might have been an unfriendly witness, it could have cross-examined him as if he were one of the persons mentioned in section 2055 of the Code of Civil Procedure. In fact, it attempted to call him as such. The court properly sustained the objection that he was not one of those covered by the section. The city states that it "did not know exactly what it could prove by the witness" and then refers to *Lawless* v. *Calaway,* 24 Cal. 2d 81 [147 P.2d 604], which holds that no offer of proof is required where the witness can be examined under section 2055 as such an examination "is often exploratory." (P. 91.) But, as pointed out above, Kennedy could not have been examined under section 2055, and if called as a witness by the city, it would have been bound by his testimony. That the proposed

examination of Kennedy was merely exploratory is shown by the city's statement of not what it expected him to testify, but what it wanted to examine him about. It is obvious from the statements in the brief that most of what the city intended to ask Kennedy was inadmissible; for example, Mrs. Murphy testified that Kennedy had suggested the 90 feet in her statement. The city says it wanted to ask him what his reasons for doing that were. His reasons would be immaterial. None of the matters proposed to be asked Kennedy would have been contradictory to the evidence adverse to the city nor in support of the city's contentions. Boiled down, the city's complaint is that it was not permitted to go on a fishing expedition with Kennedy. It has failed to show in any way that it was damaged by the court's refusal to let Kennedy testify, nor that his testimony would be vital.

*Admission of Testimony.*

Brodose was asked by his own counsel on direct examination if after the accident he looked to see if there were any marks made on the street by his cab while it was being pushed by the car and while he was holding on to the brakes. The city's objection that this called for the witness' opinion and conclusion was overruled. Again, he was asked if he could identify on a photograph in evidence, the marks he saw on the street made by his cab after it was hit by the car. A similar objection was overruled. While the objections were good and should have been sustained, no prejudice resulted from their being overruled. A reading of the transcript shows that it must have been clear to the jury that the witness was giving merely his opinion and that it was for the jury to determine when the skid marks were made.

Counsel for the city cross-examined Brodose at great length concerning how he knew that the marks were made after his cab was struck. He stated that from his experience driving cars for quite a few years he knew that going at the speed he was going when he slowed down because plaintiff was in front of him, his tires would not skid. The city's counsel then moved to strike out the witness' testimony as to when the skid marks were made, on the ground that it was based merely on his opinion and conclusion. While the motion should have been granted, no prejudice resulted. His explanation of how he knew the origin of the marks was such that if the jury did not believe his testimony as to how fast he was going (and there was evidence by the city's witnesses to refute it)

his whole conclusion would fall. His statement that the marks were made after his cab was struck was based upon and was no stronger than his testimony as to his actions after he saw plaintiff.

### 6. ALLEGED MISCONDUCT OF JUROR

■■■ This complaint is not serious, although it did involve a comedy of errors in that the wrong juror got accused. During the trial of the case Juror Brix was seen conversing with Brodose outside the courtroom. The city, in chambers, called the court's attention to this fact, and moved for a mistrial. Brodose was examined by the court in the absence of the jury. He stated that the juror said "Hello" to him and stated that his face seemed familiar. Brodose said he thought he recognized him too. The juror then asked if Brodose ever worked at Hunters Point, to which Brodose replied that when he was going to sea he did. Brodose testified that no mention of the case was made. Subsequently Juror Bront was brought into the judge's chambers. Before any questions were asked of him, other than was he Mr. Brix, counsel called the court's attention to the fact that he was the wrong juror and he was excused. Later Brix was examined. The court asked him if he had spoken to Brodose. He admitted he had, but stated that the case was not mentioned by either; that he was satisfied he had never seen Brodose before the case started; that he asked Brodose if he knew that Brix worked at Hunters Point and Brodose had replied that he used to be there too, during the war. During the interview counsel for the cab company asked the city's counsel, "Are you satisfied now . . .?" The court denied the mistrial motion. The city contends that the incident was irregular and prejudicial. It undoubtedly was irregular, but there is no showing that it was prejudicial.

### 7. ALLEGED MISCONDUCT OF COUNSEL

■■■ In his argument to the jury, counsel for defendants Brodose and the cab company said: "Number one, there is the question of the swaying of the streetcar. Now, we all know it is a matter of common knowledge, his Honor knows it, I know it, you know it. When the city took over the Market Street Railway, with its tracks and equipment, the equipment was not in the best condition, and the tracks were in deplorable condition." The city immediately cited this as misconduct. The following then occurred: "THE COURT: There is no misconduct. It is true there was no evidence or testimony offered

as to the condition of the street or tracks, rather, directly, or of the streetcar. MR. BAGLIN: And no evidence of any swaying either, your Honor. MR. MILLER: If the jurors don't have personal knowledge of that they can forget about it.'' Counsel then referred to the photograph of the roadbed in evidence and stated that the jury could see how it was ''all chewed up.'' He then called attention to a bend in the track and argued that where there is such a bend, the car is inclined to sway. The court should have instructed the jury to disregard counsel's remark. It did point out that there was no evidence of the condition of the tracks. However, with the photograph of the track in evidence, we cannot say that the remark was prejudicial.

## 8. DAMAGES

The jury awarded plaintiff $63,044.20, which the city contends is excessive. The rules applicable to the review of damages by appellate courts have been so frequently passed upon and are so well established that they do not require citation of authorities. Before this court can upset the award it must appear to us that it is so excessive as to indicate that the jury was motivated by prejudice or passion. Particularly is this so, where, as here, the trial judge on motion for new trial has passed upon the award. Nor is it a question of what damages this court would award in the first instance, nor are awards in other cases necessarily a criterion of the proper award in the instant case. The types of injury, the age, physical condition, financial status of the various plaintiffs, and the value of the dollar at the time of injury, vary so greatly that it is almost impossible to find a case where the situation is on all fours with a case at bar.

The city concedes that plaintiff suffered a comminuted fracture of the right humerus, which makes him unable to bring his arm up to a right angle with the level of the shoulder joint; also that he suffered a dislocation of the right hip joint, as to which he now has a very good movable joint; also that he had a compound, comminuted fracture of both bones of the left leg in about the middle third; a comminuted fracture of the right ankle—three prominences of the ankle joint were broken. The left leg has healed but with 1½ inches of shortening. The bony prominences of the right ankle are enlarged and not freely movable. His inability to abduct his right arm more than 45 degrees from his body constitutes more than a 50 per cent disability. By reason of the shorten-

ing of the left leg he has to wear a raised shoe and limps badly. He cannot dorsiflex the right ankle, that is, raise the foot toward the leg and force it down towards the leg normally, and has a marked decrease in motion of the ankle. He has large varicose veins and thickening of the vessels, and inflammation of the lymphatics of the leg, which came as a result of the fractures. The swelling and inflammation comes on intermittently but will be recurrent. His left knee was stiff because of the immobilization of the leg. Plaintiff's doctor and the doctor whom the city had examine plaintiff were in substantial agreement as to the nature of plaintiff's injuries and disability. The city's doctor stated in his report that plaintiff "is suffering from a very marked disability, and he will never be able to return to hard or arduous work. The condition is now permanent. . . . The patient must seek employment of a sedentary nature and certainly one not requiring standing for any length of time or walking for any distance." Plaintiff at the time of injury was 56 years of age, with a life expectancy of 23.24 years. He was confined to the hospital for a period of approximately four months. Plaintiff's hospital bill was $1,044.20. He claimed $12,000 loss of wages, or chance to work during the time he was completely incapacitated. Originally the complaint asked for $25,000 general damages. It was amended at the trial, over the city's objection, to ask for $50,000 general and loss of earnings of $12,000, which with the hospital bill totaled $63,044.20, the exact amount the jury gave. (In fact, during their deliberations, they came back to court and asked the exact amount asked for by plaintiff.)

The city attacks the $12,000 loss of earnings which the jury impliedly awarded and also the total amount of the damages on the ground that, in effect, plaintiff was an inebriate incapable of finding or holding employment, and also on the ground that the court erred in permitting plaintiff to estimate his earnings over the previous eight years, which estimate plaintiff gave as $18,000, or an annual average of $2,250. The earnings prior to the injury are admissible as evidence of the extent to which the earning capacity of the plaintiff has been impaired by the injury. (*Tornell* v. *Munson,* 80 Cal.App.2d 123 [181 P.2d 112]; *Armstrong* v. *Ford,* 30 Cal.App.2d 347 [86 P.2d 385]; *Treadwell* v. *Whittier,* 80 Cal. 574 [22 P. 266, 13 Am.St.Rep. 175, 5 L.R.A. 498].) As said in *Wilcox* v. *Sway,* 69 Cal.App.2d 560 [160 P.2d 154], the best method of proof of pecuniary loss is testimony of the

plaintiff as to his earnings for a number of years immediately prior to the accident. (*Bonneau* v. *North Shore R. R. Co.*, 152 Cal. 406 [93 P. 106, 125 Am.St.Rep. 68].) The city has cited no case holding that the testimony of the plaintiff as to his prior earnings is not admissible. There is no express limitation upon the time which this testimony may cover. The remoteness of the time affects the weight of the testimony and not its admissibility. The fact that the injured person was not employed at the time of the accident does not necessarily deprive him of the right to compensation for the loss of his earning capacity. (*Wilcox* v. *Sway, supra* [69 Cal.App.2d 560].) Actually, the city's main attack on this evidence, as well as on the award itself, is its claim that the evidence shows that plaintiff neither earned what he claimed he had earned nor had the earning capacity that the jury found. Plaintiff testified that he came to California in 1942. Prior to that time he worked in underground mining in Minnesota, and as a laborer in the car repair department of a railroad, but not steady employment, that is, only nine or ten months a year for three or four years. His work record in California was spotty. From December 17, 1942, to July, 1943, his shipyard earnings were $472.95. From July, 1943, to July, 1944, he was intermittently unemployed because of rheumatism. From February to June of 1944 he earned $100 per month as a farm laborer. At the time of the accident, April 15, 1945, plaintiff was unemployed and living at the St. Vincent de Paul Shelter, apparently on its charity. He had been on its rolls in November, 1943. From time to time he had been admitted to the San Francisco Hospital for "alcoholism" or "alcoholic addiction." The records of the hospital indicate that the day after the accident he might have suffered from delirium tremens. A couple of months after his discharge from the hospital after the accident he was again hospitalized due to a fall and the breaking of his hip, probably while intoxicated.

While the evidence would have justified the jury in finding, as contended by the city, that plaintiff was a ne'er-do-well who over the preceding eight years had earned very little money, and whose earning power at the time of the accident was practically nil, on the other hand, there was evidence which supported the jury's finding that he had the earning capacity found by the jury. Unquestionably the man was badly disabled and incapacitated from future hard work, the

only type of work for which he was fitted. In view of the seriousness of his injuries we cannot say that the verdict is excessive.

## OTHER MATTERS

■ It is not clear from the city's briefs whether it claims the court erred in refusing to allow it to call the witness Klein as its witness, when on cross-examination the court sustained· an objection to a question put to the witness as not being proper cross-examination, or whether the incident is pointed out solely for the purpose of contrasting it with the situation when, over the city's objection, the court permitted plaintiff to make Blake his witness during plaintiff's cross-examination (one of the nine incidents of alleged misconduct heretofore mentioned). Whether during cross-examination a party will be permitted to make the witness his own, is a matter entirely in the discretion of the trial court. While, in view of the court's action as to the witness Blake, it probably would have been better for plaintiff to accede to the city's request, we cannot say that the court abused its discretion to the point of being prejudicial.

■ In its reply brief the city raises for the first time 13 other claims of misconduct by the judge. It would appear that in the voluminous opening brief and the fine-tooth-combing with which the city went over the record, raising every possible contention, serious and not serious, nothing would have been overlooked. We have endeavored to cover every point raised by the city, and in spite of the rule that we have the right to disregard issues raised for the first time in the reply brief, have considered them. They relate to the court's limiting the city's cross-examination of certain witnesses, and the comments of both the court and opposing counsel concerning the length of the trial. In practically every instance the matter sought to be gone into on cross-examination had been covered more than once before. Both the limitations and the comments were because of the city's delaying tactics and the court's effort to speed up the trial. The court had the right where the trial dragged almost interminably, as did this, to try to speed it up. The city's actions were responsible for the comments.

There was no misconduct in the action of the plaintiff in asking certain questions of the city's investigator Worcester. The city did not object to them. ■ On one occasion the cab company counsel accused the city's counsel of trying to keep the truth out of the case, when the city interposed

an objection. The court promptly and at some length admonished the jury to disregard the remarks. This fully met the situation.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied October 14, 1950, and appellant's petition for a hearing by the Supreme Court was denied November 13, 1950. Shenk, J., and Edmonds, J., voted for a hearing.