[No. B004462. Second Dist., Div. Five. Aug. 22, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIANO JIMENEZ, Defendant and Appellant.

COUNSEL

William C. Spater, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and John R. Gorey, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**FEINERMAN, P. J.**—Defendant Mariano Jimenez was convicted by a jury of first degree murder (Pen. Code, § 187)[1] and attempted murder (§§ 664/ 187). The jury also found that the defendant personally used a firearm, a handgun, in the commission of both the murder and the attempted murder (§ 12022.5). Defendant's motion for a new trial was denied and he was

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

sentenced to a total of 27 years in state prison. Relying primarily on *Davis v. Alaska* (1974) 415 U.S. 308 [39 L.Ed.2d 347, 94 S.Ct. 1105] and *People v. Adams* (1983) 149 Cal.App.3d 1190 [197 Cal.Rptr. 623], defendant contends that the trial court committed prejudicial error when it did not permit defendant's trial counsel to cross-examine two key prosecution witnesses on their possible parole or probation status. We proceed to examine this claim in the light of the distinctive facts of this case.

## BACKGROUND

Distilled to its essence, this proceeding concerns the killing of an innocent bystander by the defendant while defendant was chasing and shooting at a second victim. These violent events took place on July 14, 1983, at approximately 9:30 p.m. on 10th Avenue near 104th Street in the City of Inglewood. Dino Hearns (Hearns) was talking to his friends Freddie Davis (Davis) and Ronald Whitfield (Whitfield) when Hearns heard three or four gun shots. Hearns saw his brother, Cary Avery (Avery), running in a zigzag motion and observed defendant chasing after Avery and firing shots from a pistol at Avery. Hearns testified that he had known the defendant for about four or five months, had seen him about fifteen or sixteen times during this period, and that he was told that defendant's name was "Amawa." Hearns ran away from the area when the defendant came close to him.

Jerry Carr (Carr) was talking to someone on 10th Avenue near 104th Street when he heard shots from a passing car. He observed defendant getting out of the car and chasing after someone. The defendant was yelling "Avery" and was shooting a gun. After the shooting, Carr saw the defendant in the front passenger seat of an automobile speeding away from the crime scene. Defendant's hand was hanging out the window of the automobile and he was holding a gun. On September 20, 1983, Carr identified the defendant from a photographic lineup.

Davis was talking to Hearns and Whitfield on 10th Avenue when he heard some shots. He ran approximately 20 feet to a place of hiding. About two minutes later, after the shooting had stopped, he returned to his original location and found Whitfield's body lying on the ground. Whitfield had a small blood stain on his side and was lying in a "balled up" position. Davis indicated that he did not see the shooting and did not know the identity of the shooter.

Avery was walking on 10th Avenue when he saw a speeding dark colored Camaro coming his way. Defendant exited and asked him if he was "Ave." Avery said, "no," and started running when the individual who had confronted him started shooting at him. Six shots were fired at Avery as he ran

down the street trying to dodge the bullets. One of the bullets hit his tennis shoe and bounced into his shoe.

On July 27, 1983, Avery identified the defendant as the person who was shooting at him on July 14. His identification was made after examining a group of mug shots shown to him by the police. At the time of the preliminary hearing (Aug. 25, 1983), Avery corroborated his earlier identification and indicated that the defendant was known to him as "Amawa." However, at the time of trial Avery equivocated in his identification of defendant. When he was asked to pick out his assailant in the courtroom, Avery stated, "I see someone who look like him" and pointed to defendant. Later on Avery testified, "I am saying he looks like him, but he might not be. I don't think he is." Avery admitted that he had talked to the defendant after the preliminary hearing while they were both locked up in the county jail. He also admitted that he had "dope dealings" with the defendant.

Detective Russell Enyeart of the Inglewood Police Department interviewed Avery on July 27 and testified that Avery picked out the defendant's mug shot that day from a group of photographs without any hesitation and said, "that's the guy that tried to kill me."

The defendant took the stand and testified on his own behalf. He denied being at the location of the shooting on July 14. He also denied having a gun in his possession that day. He stated that he was at his home with his sister-in-law, Elaine Roig (Roig), on the night of the shootings. In rebuttal, the People subpoenaed Roig as a witness. She testified that the defendant was not with her at any time on July 14, that she was not in the vicinity of 108th Street and Broadway (where the defendant lived) at any time on July 14, that she was in the process of moving into a new apartment on July 14, and that the defendant was not her brother-in-law.

When Hearns, Carr, and Avery were examined in court, they each admitted they had been convicted of felonies. Defendant's attorney requested permission from the court to inquire into the probation or parole status of Hearns and Carr. The court denied the request. However, pursuant to a stipulation received from the People, the court advised the jury, "that the witness Carr, at the time he identified the defendant, was in custody, and *there was a question of whether he had violated his parole.* That fact may be taken into consideration by you and may be argued by counsel for the defense. (Emphasis added.)"

In his closing argument to the jury, defendant's attorney made the following statement to the jury with reference to the testimony of Hearns: "Let's go to the question of bias, interest or motive. Let's take a look, first, at Mr.

Hearns. Mr. Hearns is interested. He has got a brother who was shot at. He has a friend who was killed. He is interested.

"He is biased? He is biased from that alone? Possibly. Maybe not. He was in custody on the second time that he identified the photograph; that is, he identified him by phone to the officer the first time. The second time he was shown a photograph, I think it was in October, and he picked out the photograph.

"At that time he was in custody. Mr. Hearns was in custody that second time. We don't know why. You cannot speculate as to why he was in custody, but he was in custody. Is he now going to cooperate with the police or not cooperate with the police? He has reasons to cooperate. Any non-cooperation by him while he is in custody isn't going to make it easy for him."

### DISCUSSION

In *Davis* v. *Alaska, supra,* 415 U.S. 308, a scenario unfolded reminiscent of the colorful narrative verse of Robert Service.[2] In the wee hours of a cold February morning, there was a burglary in the Polar Bar in Anchorage. A safe containing more than $1,000 in cash and checks was removed. Later that day, the safe was discovered about 26 miles outside Anchorage near the home of Jess Straight and his family. Richard Green (Green), Jess Straight's stepson, told investigating officers that he had seen and spoken to two black men who were near a late-model Chevrolet sedan parked where the safe was later discovered. Green indicated that one of the men was holding a crowbar. The next day Green viewed a number of mug shots and identified Davis as the man he had seen holding the crowbar. Davis was ultimately arrested, charged and convicted of grand larceny and burglary.

Prior to the taking of any testimony in Davis' trial, the prosecution moved for a protective order to prevent any reference, in the course of cross-examination, to Green's juvenile record and the fact that he was on probation by order of the juvenile court. The trial court, relying on Alaskan law protecting the anonymity of juvenile offenders, granted the prosecutor's motion. The United States Supreme Court reversed, holding that the Sixth Amendment right of confrontation of witnesses requires that a defendant in a state criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status, notwithstanding that such impeachment would

---

[2]Poet Robert Service's work includes such classics as The Spell of the Yukon, The Shooting of Dan McGrew, Bar Room Ballads and other robust tales of Alaskan life.

conflict with Alaska's asserted interest in preserving the confidentiality of juvenile delinquency adjudications. The court emphasized the fact that Green's testimony was a crucial link in the prosecution's case against Davis. Because Green was on probation, said the high court, he might have falsified his story under undue police pressure not only "to shift suspicion away from himself as one who robbed" the premises in question, but also "under fear of possible probation revocation." The Supreme Court explained that Davis' attorney did not seek to impeach the credibility of the juvenile, but to show his potential bias or prejudice based on concern of jeopardy to his probation. (*Davis* v. *Alaska, supra,* 415 U.S. 308, 311 [39 L.Ed.2d 347, 350].)

In *People* v. *Adams* (1983) 149 Cal.App.3d 1190 [197 Cal.Rptr. 623], the defendant Robert Adams (Adams) was found guilty of two counts of forgery (§ 470). Steve Wilson (Wilson) was the only witness to give direct testimony regarding the theft of four checks by Adams. Wilson testified that he saw Adams take four checks from a truck, saw the checks later that evening, and observed Adams cashing the checks. Adams testified that he received the checks from Wilson, that they were already signed at the time, and that Wilson told him the checks were in payment for work that Adams and Wilson had done for Adams' stepfather, Dale Hannah. When these events had taken place, Wilson was on juvenile probation. Adams' attorney attempted to cross-examine Wilson regarding his status as a juvenile probationer, but he was not permitted to do so by the trial court. The appellate court reversed, citing *Davis* v. *Alaska, supra,* 415 U.S. 308, and holding that Wilson's "status as a probationer was relevant to impeach his testimony for bias, prejudice and his possible motive to cooperate with the authorities, regardless of the act that got him on probation in the first place." (*People* v. *Adams, supra,* 149 Cal.App.3d 1190, 1193.)

In *People* v. *Espinoza* (1977) 73 Cal.App.3d 287 [140 Cal.Rptr. 846], the defendant Joseph Jesse Espinoza (Espinoza) was found guilty of assault with a deadly weapon (§ 245, subd. (a)). The victim, Roddrick Devious Johnson (Johnson), was shot in the arm by defendant. Defendant testified that he believed Johnson was a fleeing felon and had shot him because he believed Johnson had robbed defendant's place of business. Johnson was the key witness against Espinoza. The trial court prohibited cross-examination of Johnson concerning his probationary status. The appellate court reversed, holding that "a witness' probationary status may be used to show his potential bias or prejudice based on concern of jeopardy to his probation." (*Id.,* at p. 291.)

Turning to the case at bench, we initially point out certain significant procedural and factual differences between this case and the cases previously

discussed. ■ Here, we are dealing with the testimony of three witnesses, Carr, Hearns and Avery, and not with the testimony of a single key witness whose testimony was the linchpin of the prosecution's case. Any *Davis* error in not permitting cross-examination of Carr as to his probation or parole status was cured when the trial court advised the jury, pursuant to stipulation, "that the witness Carr, at the time he identified the defendant, was in custody, and there was a question of whether he had violated his parole." The court went on to further advise the jury, "That fact may be taken into consideration by you and may be argued by counsel for the defense." Defendant's attorney did make such an argument, telling the jury: "Here is a man who is on parole, and, boy, does he have a reason to cooperate with the police. Any lack of cooperation by him, his parole is violated. And his parole being violated, he goes back to some form of a prison or jail automatically for violation of probation. There is a man who has got a bias, a motive, has got reason. . . ."

Unlike *Davis, Adams* and *Espinoza,* where the probationary status of the key witnesses was known to all the parties and evident from the record, the record here does not disclose whether Hearns was on probation or parole. It appears that the defendant did not attempt to discover this information prior to trial and he did not make an Evidence Code section 402 motion prior to the commencement of the trial to determine the preliminary fact of probation or parole status. Given the fact that the prosecutor in this case stipulated to the parole status of Carr for the record, it is conceivable that Hearns was not on probation or parole. What is evident from the record is the fact that the jury was advised that Hearns was a convicted felon and was advised that Hearns was in custody when he identified the defendant for the second time to the authorities.

Defendant's attorney was able to make a strong argument to the jury impugning Hearns' motive in testifying for the prosecution. The jury was told by defense counsel, "You cannot speculate as to why he was in custody, but he was in custody. Is he now going to cooperate with the police or not cooperate with the police? He has reasons to cooperate. Any noncooperation by him while he is in custody isn't going to make it easy for him." With the information the jury had about Hearns, the defendant was able to argue the potential bias or prejudice of the witness and demonstrate his possible motive to cooperate with the authorities based on his custodial status and his record as a convicted felon. Assuming, arguendo, that Hearns was on probation or parole, it would not have added much to the constellation of facts utilized by the defendant's attorney in making his closing argument to the jury. This does not alter the fact that the court erred in not permitting the defendant to explore the probationary or parole status of

Hearns, but it does bear on the question of whether or not prejudicial error was committed by the court.

We also note that the identifications made by Carr and Hearns were corroborated on July 27 and August 25, 1983, by Avery. Avery did equivocate in his testimony at the time of trial, but it is clear that he did so after conversing with the defendant, with whom he had had prior drug dealings, while they were both in custody in the county jail. The jury could give whatever weight they deemed appropriate to Avery's testimony.

Another significant factor in this case is the complete impeachment of defendant's alibi. He denied being in the area of the crime on July 14 and claimed he was at home with his "sister-in-law," Elaine Roig. She was subpoenaed by the People and completely destroyed the defendant's alibi. She indicated that she was not with the defendant at his home on July 14, was moving into a new apartment that day, and was not related by marriage to the defendant.

In conclusion, we find that any violation of defendant's Sixth Amendment rights resulting from the trial court's denial of defendant's request to examine witnesses Carr and Hearns on their probationary or parole status was harmless beyond a reasonable doubt (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]).

The judgment is affirmed.

Hastings, J., and Eagleson, J., concurred.