[No. F003986. Fifth Dist. Feb. 14, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT VALDEZ, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of Parts I, II, V and VI.

## Counsel

Michael T. Solomon, under appointment by the Court of Appeal, and Richard Jay Moller for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert D. Marshall and Gelacio L. Bayani, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WOOLPERT, J.**—Following jury trial, appellant Robert Valdez was convicted of rape (Pen. Code § 261, subd. (2).)[1] The jury also found true the following enhancements: personal use of a deadly and dangerous weapon to commit the rape (§ 12022, subd. (b)); infliction of great bodily injury in the commission of the rape (§ 12022.8); and infliction of great bodily injury upon a person 60 years or older in the commission of the rape (§ 1203.09).

Appellant filed this appeal following the court's imposition of a fourteen-year sentence consisting of eight years for the rape, five years for the section 12022.8 great bodily injury enhancement, and one year for the use enhancement.

### THE FACTS

On August 16, 1983, about 6:20 a.m., an 82-year-old woman, Ms. K., awoke in her home near the corner of Ash and Pacific in Bakersfield to find a man bending over her. The man held a knife in his hand and said, "See this knife. I will kill you, I will kill you." Although the man put a pillow

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

over Ms. K.'s head, she was able to identify him as a Mexican of stocky build between 30 and 40 years of age and wearing dark clothing.

After voicing crude sexual overtures, appellant removed Ms. K.'s pajama bottoms and walked across the room to pull down window shades. He then returned and inserted his penis into her vagina. Ms. K. talked to the man, trying to "shame" him, but to no avail. He pulled her legs so far apart that it was painful. Again he inserted his penis into her vagina. Ms. K. twice told her assailant to stop and even offered him money to stop, but he did not relent. During that time Ms. K. smelled a strong odor of garlic coming from her attacker. The man finally threw Ms. K. face down on her bed and attacked her from the rear, forcing his penis in her vagina. The entire sexual assault lasted between 15 and 20 minutes.

The assailant fled Ms. K.'s house from the front door about 6:40 a.m. leaving his victim in a startled, stunned, shocked and hurting state. Ms. K. then dressed, walked to her neighbor's house and called the police. She later went to the hospital where an emergency physician, Dr. Grubbs, examined her. Dr. Grubbs found three tears around the outside of the vagina, another two tears around the urethra, and two other tears inside the vagina. There was a small amount of blood inside the vagina. Dr. Grubbs characterized the amount of tears as very unusual, saying that there were more tears than he had ever seen in his experience. According to Dr. Grubbs, Ms. K. suffered "substantial short term injuries" which he expected would heal in three to four days. He diagnosed her condition as "traumatic vaginal penetration."

About 6:20 or 6:25 a.m. on the 16th, Hussein Hussein, who operated a local market located across the alley from appellant's house, saw appellant walking fast sideways near the corner of Ash and Pacific. According to Hussein, appellant wore green clothing. During this time appellant and Hussein made eye contact at least twice. Hussein was certain it was appellant whom he saw; he had seen appellant in the market on at least 10 occasions prior to August 16. Later that morning he again saw appellant in his market. However, appellant had changed his clothes and wore dark glasses.

Around noon that same day, Kern County Sheriff's deputies went to appellant's house. A short while later appellant drove up in a Ford automobile. When one of the officers, Rutledge, asked appellant his name, appellant said Tony Valdez. Appellant told another officer his name was Tony Lopez. Officer Rutledge found a knife under the front seat of the Ford. The length of the blade was approximately the same as the blade of the knife used by Ms. K.'s assailant.

Later on the 16th, Rutledge spoke with appellant's live-in girlfriend, Dora Hernandez, and his sister-in-law and coworker, Sylvia Valdez. Hernandez told Rutledge appellant was out of the house between 5:45 a.m. and 7 a.m. that day. Valdez told Rutledge appellant worked in a garlic shed the week before the 16th and people who worked in the garlic shed smelled of garlic.

The next day Rutledge went to the victim's house. At the rear of the house the officer saw a boot print which was later photographed. Thereafter, Rutledge went back to appellant's house and, with Ms. Hernandez' permission, took appellant's work boots and booked them into evidence.

Gregory Laskowski, a criminologist for the Kern County Crime Laboratory, testified he analyzed and compared enlarged photographs of a partial boot print and heel print obtained at the crime scene with appellant's work boots. He concluded a 90-percent probability existed that appellant's left boot made the print depicted in the enlarged photographs.

Vernon Kyle, the head of the Kern County Crime Laboratory, testified from his examination of certain evidence: (a) a portion of the crotch area of Ms. K.'s panties had bloodstains and was positive for the presence of semen; (b) the crotch area of Ms. K.'s pajama bottoms had bloodstains; (c) appellant's underwear had blood and seminal stains; (d) Ms. K.'s bedsheet had at least three areas which were positive for the presence of semen; and (e) a white handkerchief which Ms. K. used contained blood and seminal stains. Further, Kyle noted Ms. K.'s blood type was type A, appellant's blood type was type O, and both Ms. K. and appellant were secretors, meaning they exhibited their blood type through their body fluids. In Kyle's opinion the seminal stain on the bedsheet came from a type O secretor and exhibited activity consistent with appellant's blood type.

Kyle concluded, from the various blood and seminal stains, appellant could not be eliminated as a contributor. He initially stated the percentage of the Caucasian population with the blood type found in the seminal stains was 6 out of 100. However, after extensive cross-examination, he testified that for the Mexican-American population, 27 out of 100 (27 percent of the population) would have the same blood type found in the seminal stains in the instant case.

Appellant, testifying on his own behalf, denied he went to the victim's residence or her backyard on the morning of August 16, 1983. He also denied he was at the corner of Ash and Pacific about 6:40 a.m. of the same day. He testified that on August 16 about 5:10 a.m., he drove to a telephone

booth and called Sylvia Valdez to tell her he was not going to work. He testified he then went home, took off his clothes and went back to sleep.

DISCUSSION

I.-II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III.

*Motion to Exclude Witnesses.*

 Appellant next complains he was deprived of expert testimony because he had only one expert and wanted to use him for two purposes. First, he wanted his expert to sit by his counsel's side to assist in the cross-examination of the prosecution expert. Then he wanted his expert to testify as a defense expert witness. However, as the prosecutor prepared to call her expert, the last case-in-chief witness, she moved to exclude witnesses from the courtroom. The appearance of appellant's expert seated with his counsel motivated the prosecution's motion. While the court granted the motion to exclude, it permitted appellant's expert to remain and assist counsel in cross-examining the prosecution's expert witness. Defense counsel did not later call his expert as a witness.

Appellant raises very practical questions concerning the right of the trial court in a criminal case to exclude potential witnesses and to enforce its order if the motion is granted. Appellant argues he was entitled, as a matter of fairness grounded on Sixth and Fourteenth Amendment principles, not only to have his expert witness assist counsel in cross-examining the prosecution's expert, but also to call this same defense expert as his witness.

According to appellant, the denial of his right to call any witness who would give relevant and competent evidence infringes on his Sixth Amendment right to present a defense. In effect, appellant contends the trial court's error forced him to the Hobson's choice of having his expert witness remain in the courtroom to advise defense counsel during the cross-examination of the prosecution's expert witness or testify as part of the defense case. Finally, appellant asserts that if the trial court makes an exclusion order, it

---

*See footnote on page 680, *ante.*

cannot enforce the order by depriving the defendant of the testimony of an important witness who remains in court after the order is made.

▉ The exclusion of witnesses from the courtroom is a matter within the trial court's discretion. (See *People* v. *Garbutt* (1925) 197 Cal. 200, 205 [239 P. 1080]; Witkin, Cal. Evidence (2d ed. 1966) § 1100, p. 1018.) Evidence Code section 777 entitled "Exclusion of Witness" provides in pertinent part that "[t]he court may exclude from the courtroom any witness not at the time under examination *so that such witness cannot hear the testimony of other witnesses.*" (Italics added.) The purpose of the order is to prevent tailored testimony and aid in the detection of less than candid testimony. (*Geders* v. *United States* (1976) 425 U.S. 80, 87 [47 L.Ed.2d 592, 598-599, 96 S.Ct. 1330].)

In this regard, some reviewing courts have recognized the difference between "percipient" witnesses who testify to observed facts in the controversy, and expert witnesses who express their opinions on the basis of hypothetical facts, personal knowledge of facts not in controversy, or testimony they hear in court. For example, in *People* v. *Maxey* (1972) 28 Cal.App.3d 190, 198-199 [104 Cal.Rptr. 466], after finding no merit in the defendant's contention that the prosecution psychiatrist should have been excluded from the courtroom while the defendant's medical expert testified (no objection having been made), the court observed that "both experts were merely testifying to their medical opinions. Under these circumstances, it was highly desirable that they should hear each other's testimony."

At least two jurisdictions have specific rules permitting the exemption of expert witnesses from sequestration. Maryland Rules of Procedure, rule 755, specifically exempts expert witnesses. (See *Johnson* v. *State* (1978) 283 Md. 196 [388 A.2d 926].) Federal Rules of Evidence, rule 615, specifically exempts any "person whose presence is shown by a party to be essential to the presentation of his cause."[4]

The circumstances under which an expert witness may be exempted from sequestration under rule 615 is explained in *Morvant* v. *Const. Aggregates Corp.* (6th Cir. 1978) 570 F.2d 626, cert. dism. 439 U.S. 801 [58 L.Ed.2d 94, 99 S.Ct. 44]. In *Morvant,* the court held: "[W]here a party seeks to except an expert witness from exclusion under Rule 615 on the basis that

---

[4]Federal Rules of Evidence, rule 615, in its entirety reads as follows: "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause."

he needs to hear firsthand the testimony of the witnesses, the decision whether to permit him to remain is within the discretion of the trial judge and should not normally be disturbed on appeal. [Citation.] On the other hand, where a fair showing has been made that the expert witness is in fact required for the management of the case, and this is made clear to the trial court, we believe that the trial court is bound to accept any reasonable, substantiated representation to this effect by counsel." (*Id.*, at p. 630.)

*Morvant* was a wrongful death action by the wife and children of a tugboat captain who drowned in the Mississippi River. The trial court excluded plaintiff's expert witness after plaintiff's counsel asked that his expert be permitted to remain and "hear the testimony of the other witnesses so that he could testify on the issue of causation." (*Id.*, at p. 629.)

Appellant in this case had a different reason for keeping the potential witness in court. Defense counsel wanted his expert by his side to help him "understand the testimony" of the prosecution's expert and cross-examine the expert as well. Citing *Lewis* v. *Owens* (10th Cir. 1968) 395 F.2d 537, 541, appellant contends it is "well-settled" that the court should not exclude an expert who is needed to advise and assist counsel while the opposition's expert testifies on technical matters. We have reviewed the *Lewis* decision which does nothing more than restate the trial court's discretion to make exceptions to its exclusion order. We know of no rule that an "elbow expert" is a matter of right for cross-examination purposes.

However, applying the same rule recited by the *Lewis* court, we conclude there was no abuse of discretion here. Trial counsel did not give the court any persuasive reason for denying outright or making an exception to an order granting the prosecutor's motion to exclude witnesses. Undeniably, trial counsel would feel more comfortable with an elbow expert. Also there may be some psychological advantage to having one expert facing the other during testimony. Nevertheless, defense counsel failed to show the trial court good cause for his expert's presence during the prosecution's expert testimony.

Appellant now claims it was "unrealistic to expect that a defense attorney unknowledgeable in the scientific and highly technical area of the proportion of blood-types in particular racial groups of persons could have as effectively cross-examined and impeached the prosecution's expert witness without his own expert in the courtroom assisting him." However, we assume defense counsel consulted with his expert and had sufficient knowledge of the subject to present his expert as a witness. Presumably such an attorney should be equally competent to cross-examine the opposition's expert. Competent trial attorneys routinely engage in litigation involving technical in-

formation such as forensic medicine, pathology, laboratory testing, prints and mental competence.

In response to appellant's claim of forced choice, we note the following. To begin, this exchange took place after the prosecutor's motion to exclude witnesses:

"[DEFENSE COUNSEL]: . . . I do have a defense expert sitting with me as it relates to the forensic and serologic work done by the lab, and now we have a motion by the People to exclude witnesses, specifically aimed at hampering defense's ability to understand the testimony [of the prosecution's expert] and to make an election whether or not to use his own expert. The motion is untimely.

"THE COURT: Why does it require an election to be made?

"[DEFENSE COUNSEL]: *If I am to have [my expert] testify in this case and he sits in to assist me in the cross-examination of People's witness, then he would be unable to testify on defense's behalf should I decide to do that.*

"THE COURT: But certainly—

"[DEFENSE COUNSEL]: *I have to make the election either to have [defense expert] assist me in cross-examining People's witness or to have him sit outside and then just use him as my witness.* I think the motion to exclude is untimely." (Italics added.)

In granting the motion, the trial judge commented:

"Then I am going to grant the motion to exclude witnesses, and I am going to require that if indeed this witness on behalf of the defense does testify, he must remain outside of the presence of [the prosecution expert's] testimony, and the reason is not that I am trying to deprive defense counsel of assistance in preparing the case and conducting the case, but it seems to me when we get into an area, as I would assume this testimony, both these experts, the technical nature of it, that it is important both of them testify without being influenced by the testimony of the other. So the motion will be granted.

"I would also note for the record that throughout the entire testimony there have been no witnesses in court observing prior to their testifying. Indeed, none of them have remained even after testifying. So the prosecution has not taken advantage of the failure to make the motion by having

witnesses in court. There has been no one except the designated investigating officer, Officer Rutledge."

This exchange made it clear that defense counsel knew the consequences of the court's ruling. Defense counsel then made his election:

"[DEFENSE COUNSEL]: Based on the Court's ruling, I would ask to be allowed to consult with [my expert] during cross-examination of prosecution's expert.

"THE COURT: Yes, you may."

The record reflects the court simply permitted counsel to obtain assistance from his expert during cross-examination. It did not make a general order excluding witnesses and then "except" the expert whose appearance triggered the motion and order to exclude.[5]

As previously noted, defense counsel made no attempt to call the witness or gain relief from the exclusion order. We must presume if defense counsel later thought it important to call his expert as a witness, that defense counsel would have so moved and the trial court would have listened carefully to defense counsel's offer of proof and explanation as to the importance of the expert's testimony. If this had been done, we also presume the trial court would have carefully reconsidered its prior order.

However, defense counsel may have had good cause for not calling his expert as a witness. Mr. Kyle, the prosecution's expert, testified that only 6 percent of the Caucasian population would have blood and urine types similar to appellant's and those found in the semen stains, the victim's underclothing, and bed covers. On cross-examination of Kyle, with the aid

---

[5]The dissent perceives an entirely different scenario. However, in granting defense counsel permission to consult, the trial court did nothing more than afford counsel the courtesy of having his expert sit at counsel table during cross-examination.

Appellate counsel even now does not make the contention urged by the dissent. It was obvious from the beginning that defense counsel argued for the right to use his expert for both stated purposes and the court limited him to one use. There was no misunderstanding. Furthermore, the prosecuting attorney who successfully obtained the exclusion order would have objected to the request that the expert remain in the courtroom if anyone would think the expert would thus be excepted from the exclusion order. There was no such objection by the prosecution.

If the dissent's position were the rule, trial courts would necessarily deny requests to consult during cross-examination. A trial court would know, based on the dissent, that if it granted counsel permission to consult with an expert during cross-examination, its exclusion order would lose its intended effect and be inapplicable to the expert. Granting such permission would be self-defeating to the court's goal of preventing potential witnesses from hearing other witnesses' testimony. We doubt the dissent intended a rule the logical result of which would prohibit counsel from receiving assistance during cross-examination.

of the defense expert, counsel was able to establish quite clearly that 27 percent of the Mexican-American population could have produced blood and semen stains similar to appellant's. Since appellant is Mexican-American and the victim identified her assailant as being Mexican-American, this prosecution concession was important to the defense. Defense counsel emphasized this testimony in his closing argument to the jury. Thus, appellant did not need the testimony of his defense expert to establish the 27 percent Mexican-American population data.

Because defense counsel deferred to the trial court's order and did not seek relief from it, appellate counsel asserts coercion. The trial court purportedly forced an election which, even though accepted without further contest, was immediate error because the trial court could not enforce its order. We address this proposition because it appears to be a dangerous overstatement of California law. Under this approach it made no difference what defendant did once the order was made: the order required appellate reversal. We disagree.

We illustrate with a variation of our facts. A defendant wishes to present expert testimony. However, he also wants his witness to hear what the prosecution expert says and to help in the cross-examination of the prosecution witness. The court responds this would be unfair and orders all witnesses excluded. Defense counsel later brings his expert witness into the courtroom where he remains. During recesses the expert gives defense counsel advice. Later defendant calls the same expert as his witness, thus violating the order. What may the court do?

First, under appropriate conditions, the court could reconsider its exclusion order and permit the witness to testify. Obviously the court may not want to do so because of the flagrant challenge to its authority. Second, a careful judge could research and discover that contempt of court, not the exclusion of testimony, is the appropriate remedy when a witness has violated the court's order excluding witnesses. (Witkin, Cal. Evidence (2d ed. 1966) § 1100, pp. 1018-1019; 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 27.24, pp. 838-839.) However, we have examined this statement of law and find it only a half truth. Under the hypothetical facts just stated, we conclude the court could properly refuse to permit the witness to testify. The textbook statement of the rule applies only when the violation of the order is not chargeable to the party or counsel.

Neither Evidence Code section 777, applying to trials, nor Penal Code section 867, applying to preliminary hearings, includes any enforcement provision. Nevertheless, implicit in the right of the court to exclude witnesses is the right of the court to enforce its order. Clearly, if the judge

could recognize every potential witness, the judge could interrupt the proceedings periodically and order the bailiff to enforce the order. Yet witness selection is in the hands of counsel, and trial judges may not compel advance disclosure of all potential witnesses. Indeed, the judge probably would not recognize all such witnesses if present in court. Thus, the routine result of the order is the use of a sign at the courtroom door indicating witnesses are excluded. The court expects when it makes the order, witnesses then present in court will leave. The court equally assumes as time passes, newly arriving witnesses will observe the sign on the door and remain outside. It is also anticipated trial counsel will advise witnesses to remain outside until they have testified and are excused.

■ Frequently courts have stated the remedy for a violation of an exclusion order is contempt, not disqualification of the witness. The California rule had its first statement in *People* v. *Boscovitch* (1862) 20 Cal. 436. Indeed, some courts state the rule as one without exception. (See Annot., Effect of Witness' Violation of Order of Exclusion (1967) 14 A.L.R.3d 16.) In California, subsequent cases have repeatedly stated the general rule, omitting any suggestion that it may have exceptions. However, the precise language of the Supreme Court is to be carefully noted: "If the witnesses offered disregarded the rule of the Court excluding their presence, until called, during the progress of the trial, the Court might have punished them as for a contempt. The fact constituted no ground for the exclusion of their testimony. The defendant could not enforce the rule, and to deprive him of the benefit of their testimony for its disobedience, *without fault on his part,* was manifestly unjust and illegal." (*People* v. *Boscovitch, supra,* 20 Cal. 436, italics added.)

"Without fault," or its opposite, "with fault," are words of significant meaning. None of the cases after *Boscovitch* suggest counsel may defy the court's exclusion order, insist on the presence of the witness, and successfully assert a constitutional right to the witness' testimony absent good cause. "With fault" does not require defiance of the court order excluding witnesses. A party who recognizes the court's authority and chooses to keep a potential witness present presumably does so knowing that except on good cause the witness will no longer be available for testimonial purposes. Later, if the party seeks to call the witness who remained in the courtroom, the prior knowledge of the court order and apparent election to keep the witness present will be deemed "fault" as in "you were responsible for keeping the witness present." We will use the term "with fault" in this broad sense.

The authors of the annotation noted above characterize California as among the states which recognize the rule to be a conditional one: "[I]t has

been held or recognized . . . that where a witness who has been put under the rule violates the order of the court *without the consent, connivance, or procurement of the party calling him* or of the counsel representing such party, the witness is not thereby rendered incompetent to testify, and that the party calling him cannot, on account of the violation of the order *without the party's fault,* be rightfully deprived of the testimony of such witness." (Annot., *supra,* 14 A.L.R.3d 16, 45, italics added.)

We agree that the rule stated in *Boscovitch* is a rational one of permitting the testimony when the violation of the order has not been chargeable to the party who wishes to call the witness.

Extensive quotations from Wigmore are helpful. We omit substantial footnote material supporting the text.

"If the order of exclusion is knowingly disobeyed, the court unquestionably has the power to refuse to admit the disobedient person to testify; and it ought to exercise this power, in its discretion, whenever there appears any reason that the proposed testimony was important, that the witness had heard the other testimony, and that he wished to know its tenor. It may be assumed that the power should not be exercised unless the witness, as above said, was aware of the order of exclusion, for the burden of causing every witness to be notified, and thus of preventing inadvertent violation, may fairly be placed upon the party demanding the sequestration. But granting this much, it follows that the most appropriate and only effective means of enforcing an order of court and of securing the right of sequestration is to have it clearly understood that *disqualification as a witness may follow disobedience*[.]

". . . . . . . . . . . . . . . . . . . . . . .

"There is, no doubt, something to be said against this rigorous doctrine, at least where the disobedience has occurred without any connivance of the opposing party and solely through the witness' own contumacy[.]

". . . . . . . . . . . . . . . . . . . . . . .

"But there are several answers to these arguments. In the first place, the fact that the opposing party would be deprived of valuable testimony is in itself no wrong, provided he himself has by connivance invited it. In the next place, it is usually difficult to prove this connivance, and to require it proved might entirely nullify the rule. Again, if the witness is in fact open to the charge of fraudulent evasion, he is an unsafe and untrustworthy witness; a party has no absolute right to the testimony of a trickster, and he

cannot complain, even though himself innocent, at the loss of tainted testimony; the argument of some of the judges above quoted assumes erroneously that the party could certainly prove something in his favor by a witness whose conduct has already suggested the strong probability that he will falsify. Furthermore, of two innocent parties, the contingency of suffering should clearly be for him whose witness has been in fault; and this is particularly so where it was also that party's duty, at whatever inconvenience, to secure the obedience of his own witnesses to a plain and simple order of court.

"The refusal to admit to testify need not of course be an absolute and peremptory consequence of disobedience. No one has ever contended for this; the trial court, on all the circumstances, is to determine whether this measure should be taken. But it seems clear that the court may properly take the measure in its discretion, even where no connivance by the party is made to appear.

"The difference of judicial opinion in the precedents arises chiefly over the case of a witness' *wilful disobedience without the party's connivance.* The English and Canadian rulings have fluctuated, and for those jurisdictions the question seems not to be settled.

"In the United States, the great majority of courts hold in general that *the court may in discretion disqualify the witness*; some of these courts, however, making the proviso that the party must have connived. The other courts seem to forbid in general terms the disqualification of the witness; though in some of them it can hardly be doubted that a proviso as to the party's connivance would be enforced. [*Boscovitch* cited, among other cases.]

"On the whole, then, the courts occupy a common ground where there has been fault in the party; at one extreme stand a few courts denying disqualification even in that case; at the other extreme stand probably the majority of courts, permitting disqualification even without the party's fault." (6 Wigmore, Evidence (Chadbourn rev. ed. 1976) § 1842, pp. 477-484, fns. omitted, italics in original.)

Although Professor Wigmore stresses the difficulty in proving fault may justify an absolute power of the court to enforce its order, we know of no California support for that position. The rationale of *Boscovitch* is that a party *not* sharing the fault in the disobedience of the order could do nothing about it. The court particularly emphasized the "without fault" aspect of the case. We are bound by that precedent and expect trial courts would not

so burden a criminal defendant if disobedience was not caused by the defendant or defense counsel.

Our Supreme Court has not considered a "with fault" case. In *People* v. *Duane* (1942) 21 Cal.2d 71, 80 [130 P.2d 123], the court, in a no-fault situation, cited the general rule without reference to *Boscovitch*. It, however, cited cases relying on *Boscovitch* or similar appellate cases. None of the cited cases involved a faulting defendant.

In the Courts of Appeal we find the general rule stated in "without fault" situations (*People* v. *Willingham* (1969) 271 Cal.App.2d 562, 571 [76 Cal.Rptr. 760]; *Mintzer* v. *Wilson* (1937) 21 Cal.App.2d 85, 91 [68 P.2d 370]), or in unclear factual cases (*People* v. *Duckett* (1962) 210 Cal.App.2d 867, 870-871 [26 Cal.Rptr. 926]; *People* v. *Tanner* (1946) 77 Cal.App.2d 181, 187 [175 P.2d 26]; *People* v. *Russell* (1939) 34 Cal.App.2d 665, 671 [94 P.2d 400]; *People* v. *Talkington* (1935) 8 Cal.App.2d 75, 99 [47 P.2d 368]; *People* v. *Mack* (1931) 115 Cal.App. 588, 590 [2 P.2d 209]). The common thread in these cases is reliance upon *Boscovitch*.

We have found only one Court of Appeal case involving a "with fault" party. The trial court held a witness incompetent because counsel knowingly let the witness sit in court. Citing *Boscovitch,* the appellate court held this to be error, although not prejudicial under the circumstances. (*Germ* v. *City & County of San Francisco* (1950) 99 Cal.App.2d 404, 417-418 [222 P.2d 122].) The court neither recognized nor discussed the *Boscovitch* "without fault" qualification. Therefore, we decline to find the case controlling.

If defendant "lost" a witness in this case, it was the result of choice. The witness was disqualified only because defense counsel knowingly made that choice. No authority need be cited for the general proposition that constitutional rights may be knowingly waived.

The *Boscovitch* conditional enforcement rule does not go so far as Professor Wigmore might have preferred. Nevertheless, under *Boscovitch* the trial court may consider the circumstances of the violation of the order, and if warranted, exercise discretion to relieve the party of any penalty. However, an absolute rule limiting the penalty to contempt sanctions could work unfairly to the disadvantage of the party who observes the order. Even-handed justice demands a rule which permits the disqualification of a witness when fault is shared by counsel or the party. Whether counsel recognizes the authority of the court to enforce its order and knowingly keeps the witness present, as in this case, or deviously participates in violating the order, the law will deem a waiver of any previously applicable right to

present the witness to have occurred. Only in the "without fault" case is contempt the sole sanction.

## IV.

### *Prior Felony Convictions for Impeachment.*

In an *in limine* motion, appellant sought to exclude evidence of his prior felony convictions for impeachment purposes. According to appellant, his 1967 convictions for burglary and possession of marijuana, and a 1968 conviction for assault with a deadly weapon were inadmissible because they did not involve dishonest conduct, were remote in time, and were similar to the present charges. The court denied the motion, noting all prior felony convictions were admissible "notwithstanding section 352 or any other considerations." Later, appellant took the stand in his own defense and admitted he had suffered the three felony convictions.

The Supreme Court in *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111] addressed the effect of Proposition 8 on the use of felony priors for impeachment. Justice Kaus wrote for a plurality: "[A]lways subject to the trial court's discretion under [Evidence Code] section 352—subdivision (f) [of Proposition 8] authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty. On the other hand, subdivision (d), as well as due process, forbids the use of convictions of felonies which do not necessarily involve moral turpitude." (*Id.*, at p. 306.)

Thus, a two-part test for admissibility of a prior felony conviction emerged, namely: (1) Does the felony conviction necessarily involve moral turpitude or a "readiness to do evil"? (*Id.*, at p. 314.) (2) Does the risk of undue prejudice substantially outweigh the probative value of the prior? (*People* v. *Green* (1980) 27 Cal.3d 1, 26 [164 Cal.Rptr. 1, 609 P.2d 468].)

The *Castro* court ruled that: (1) the prior in that case, heroin possession, did not necessarily involve moral turpitude; and (2) the trial court erred in concluding it lacked discretion to exclude the prior. The court found those errors were not prejudicial based on the following factors: the strength of the prosecution's case, the jury's knowledge of defendant's criminal past gained from the testimony of defense witnesses, and the fact the defendant testified.

In the present case, appellant's prior burglary and assault with a deadly weapon convictions necessarily involved moral turpitude. (*People* v. *Boyd* (1985) 167 Cal.App.3d 36, 44 [212 Cal.Rptr. 873]; *People* v. *Cavazos*

(1985) 172 Cal.App.3d 589, 593-595 [218 Cal.Rptr. 269].) Appellant's prior marijuana possession conviction, however, did not involve moral turpitude. (*People* v. *Castro, supra,* 38 Cal.3d at p. 317.) Although impeachment by such a prior is apparently a violation of the defendant's federal due process rights (*Castro, supra,* 38 Cal.3d at p. 313), the Supreme Court treated the prejudice to the defendant in the same manner as the trial court's failure to exercise its discretion with reference to the admission of priors relevant to credibility, i.e., according to the *Watson*[6] standard. (See *Castro, supra,* 38 Cal.3d at p. 319.)

We are therefore faced with two errors by the trial court, regarding (1) the marijuana possession conviction, and (2) the trial court's failure to exercise its section 352 discretion. In evaluating the prejudice to appellant, precedents require us to assume that the trial judge would have excluded evidence of these priors. The question thus is whether, absent impeachment of appellant by any of the prior convictions, it is reasonably probable that a more favorable verdict to appellant would have resulted. (Cal. Const., art. VI, § 13; *People* v. *Castro, supra,* 38 Cal.3d at p. 319; *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

The prosecution's case, albeit circumstantial, was a strong one. The victim of the rape testified the knife found under the seat of appellant's car was similar to that used in the attack. She also explained her attacker smelled very strongly of garlic. Appellant's girl friend, Dora Hernandez, and appellant's coworker, Sylvia Valdez, testified appellant had worked in a garlic shed for at least a week prior to the attack. Next, the victim testified that her attacker wore "drab" clothing. She also stated that her attacker left her house about 6:40 a.m. Hussein, who had seen appellant in his (Hussein's) market many times, testified he saw appellant dressed in green, walking sideways and fast away from the victim's home at about the same time the rape occurred. Hussein added he made eye contact with appellant twice during the encounter and that his identification of appellant was positively accurate.

Dora Hernandez testified appellant left the house early on the morning of the incident and then came back later in the morning. She said she could not remember what time he returned because she was asleep. Officer Rutledge indicated that during the course of his investigation, Ms. Hernandez related to him that appellant left the house about 5:45 a.m. and returned about 7 a.m.

---

[6] *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], cert. den. 355 U.S. 846 [2 L.Ed.2d 55, 78 S.Ct. 70].

Near the point of entry to Ms. K.'s house was a boot print in a rose bed. Gregory Laskowski, a duly qualified expert for the prosecution, testified he was "plus 90 percent certain" appellant's boots made the print. Vernon Kyle, another of the People's duly qualified experts, testified he found semen and bloodstains on the victim's panties, pajamas and sheets. He indicated appellant was in a class of persons who secrete blood into their body fluids, and that the fluid stains found on the items mentioned contained biologically significant stains which only 27 percent of the Mexican population, or 6 percent of the Caucasian population, would produce. The blood type found in the stains matched that of appellant, not that of the victim.

Not only was the prosecution's case strong, appellant's defense was highly suspect. He first testified he did not go to work on the date in question because it was raining. Later, he explained he did not go because his girl friend's child was sick. He further testified he was away from home only about 10 minutes (5:05 to 5:15 a.m.) in order to call his ride-sharing coworker. This time frame conflicts with Ms. Hernandez' prior statement to Officer Rutledge and Hussein's "positive" identification of appellant at the crime scene. Appellant also denied his presence at the crime scene.

Given the cumulative effect of the positive Hussein identification, the evidence regarding the boot print, the garlic odor, the time frame of events on the 16th, the knife, and the inconsistencies in appellant's statements before and during trial, it is not reasonably probable that a result more favorable to appellant would have occurred if he had testified without impeachment by any of the priors. (*People* v. *Watson, supra,* 46 Cal.3d at p. 836.)

V.*

. . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Martin, J., concurred.

**FRANSON, Acting, P. J.**—I respectfully dissent.

The majority holds that the trial court properly required appellant to elect between keeping his defense expert in the courtroom to assist his counsel in cross-examining the prosecution's expert witness and calling the defense

---

*See footnote page 680, *ante.*

expert as a witness. By electing to keep the defense expert in the courtroom in the face of the exclusion order, appellant waived his right to call the expert as part of the defense case.[1]

I submit, however, that although the trial court granted appellant's motion to keep his expert in the courtroom to assist in the cross-examination of the prosecution expert, appellant still had a constitutional right to call his expert as a defense witness.

The record belies the majority's assertion that "defense counsel failed to show the trial court good cause for his expert's presence during the prosecution's expert testimony" and hence ". . . the trial court did nothing more than afford [defense] counsel the courtesy of having his expert sit at counsel table during cross-examination." The record shows that defense counsel explained his need to have his expert "sit with [him]" to help in understanding the prosecution expert's testimony about forensic and serological laboratory work and to assist in the cross-examination of the expert.

The right to assistance in cross-examining an opposing expert witness is more than a mere "courtesy" to a criminal defendant; depending on the circumstances, it may touch on his Sixth Amendment right of confrontation and to manage his case. This is because of what may be the highly technical and scientific nature of the expert's testimony in any given case, thereby requiring broader cross-examination of the expert than of the ordinary witness. (See Evid. Code, § 721, subd. (a).) "Once an expert offers his opinion . . . he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, the reasons for his opinion including facts and other matters upon which it is based [citation], and which he took into consideration; and he may be 'subjected to the most rigid cross-examination' concerning his qualifications, and his opinion and its sources [citation]." (*Hope* v. *Arrowhead & Puritas Waters, Inc.* (1959) 174 Cal.App.2d 222, 230 [344 P.2d 428].)

Federal Rules of Evidence section 615 provides that "a person whose presence is shown by a party to be essential to the presentation of his cause" shall *not* be excluded from the courtroom. The Notes of the Advisory Committee on the Proposed Federal Rules state that section 615 contemplates

---

[1]The net effect of the trial court's action was to *except* the defense expert from the exclusion order. The defense expert remained in the courtroom while the other prospective witnesses presumably left the courtroom. The majority, however, treats the sequestration procedure simply as an election by appellant to keep his expert in the courtroom knowing that by doing so he would be foreclosed from testifying for the defense. I accept the majority's premise in my analysis of the case.

such persons as ". . . an expert needed to advise counsel in the management of the litigation" citing 6 Wigmore section 1841, note 4. *Morvant* v. *Const. Aggregates Corp.* (6th Cir. 1978) 570 F.2d 626, 630 explains: ". . . [W]here a fair showing has been made that the expert witness is in fact required for the management of the case, and this is made clear to the trial court, . . . the trial court is bound to accept any reasonable, substantiated representation to this effect [and to permit the witness to remain in the courtroom]."

Here, the trial court wisely granted defense counsel's request to allow his expert to remain in the courtroom and to assist in the cross-examination of the opposing expert.

Turning now to the real problem in this case—the constitutional effect of precluding a defense expert from testifying for the defense simply because he was allowed to remain in the courtroom to assist in the cross-examination of the prosecution's expert witness—I should first state what this case does *not* involve. It does not involve "fault" on the part of defense counsel, the defendant or a witness in violation of any order of the trial court. Everything that occurred in the present case accorded with the trial court's orders. Because of this, the majority's interesting but far-ranging comments about fault or connivance by counsel, a defendant or a witness concerning exclusion orders and the sanctions to be imposed for willfully disobeying such orders are irrelevant. Also, it appears the majority misunderstands appellant's argument when it says "appellant asserts that if the trial court makes an exclusion order, it cannot enforce the order by depriving the defendant of the testimony of an important witness who remains in court after the order is made." This is not appellant's contention; he does not contend that a trial court is without power to enforce its exclusion order. Rather, appellant simply asserts that where the witness remains in the courtroom *with the permission of the court*, the defendant does not thereby waive his right to call the witness as part of his defense case. He cannot be forced to elect between keeping an essential witness in the management of his case in the courtroom and calling the witness as part of his defense.

The trial judge and the majority misinterpret the power given to a trial judge under Evidence Code section 777. This statute explicitly gives the judge the discretion to "exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses." By clear implication, the statute also gives the judge the discretion to make such exceptions to the exclusion order as he may determine are necessary to enable a party to effectively cross-examine his opponent's witnesses or to otherwise manage his case. However, once the trial court permits a particular witness to remain in the courtroom because the

witness is essential to the defendant's case, the trial court's power of exclusion over that witness ends.

The concept that Evidence Code section 777 authorizes the judge by implication or otherwise to condition an order allowing a particular witness to remain in the courtroom on the witness' not later testifying for the defense impinges upon a defendant's Sixth Amendment right to present a defense. As explained by Mr. Witkin, "One of the elements of a fair trial is the right to offer relevant and competent evidence on a material issue. Subject to such obvious qualifications as the court's power to restrict cumulative and rebuttal evidence [citation], and to exclude unduly prejudicial matter [citation], denial of this fundamental right is almost always considered reversible error. [Citations.]" (Witkin, Cal. Evidence (2d ed. 1966) § 1069, p. 990.) *"Denial of the right to present evidence is even more serious in criminal trials, and is almost invariably regarded as reversible error. [Citations.]"* (Italics added, Witkin, *op. cit. supra*, § 1070, p. 992.)

In *Washington* v. *Texas* (1967) 388 U.S. 14 [18 L.Ed.2d 1019, 87 S.Ct. 1920], our high court ruled that the Sixth Amendment right to compulsory process in criminal prosecutions includes the right to present a defense which is applicable to the states through the Fourteenth Amendment. "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. *This right is a fundamental element of due process of law."* (Italics added, 388 U.S. at p. 19 [18 L.Ed.2d at p. 1023].)

Over 100 years ago, in *People* v. *Boscovitch* (1862) 20 Cal. 436, Chief Justice Field on behalf of a unanimous California Supreme Court held that where two witnesses for the defense in a robbery case had disregarded the trial court's order excluding them from the courtroom until called, although the witnesses might have been punished for contempt, it was prejudicial error for the court to deprive the defendant of the benefit of the witnesses' testimony. "The defendant could not enforce the [exclusion] rule, and to deprive him of the benefit of [the witnesses'] testimony for [their] disobedience, without fault on his part, was manifestly unjust and illegal." (20 Cal. at p. 436; *People* v. *Mack* (1931) 115 Cal.App. 588, 590 [2 P.2d 209]; *Mintzer* v. *Wilson* (1937) 21 Cal.App.2d 85, 91-92 [68 P.2d 370]; *People* v. *Tanner* (1946) 77 Cal.App.2d 181, 187 [175 P.2d 26]; *People* v. *Ortega* (1969) 2 Cal.App.3d 884, 893 [83 Cal.Rptr. 260]; Annot. (1967) 14 A.L.R.3d 16.) Thus, absent fault on the defendant's part in permitting a witness to remain in the courtroom in violation of an exclusion order, the trial court may not deprive the defendant of the benefit of the witness' testimony as part of the defense case. The majority's attempt to equate appellant's "election" to keep his witness in the courtroom during the pros-

ecution case with the "fault" concept underlying *Boscovitch* simply is wrong. (See *Holder* v. *United States* (1893) 150 U.S. 91 [37 L.Ed. 1010, 14 S.Ct. 10]; *United States* v. *Davis* (5th Cir. 1981) 639 F.2d 239, 242-243; *Braswell* v. *Wainwright* (5th Cir. 1972) 463 F.2d 1148, 1156; *United States* v. *Schaefer* (7th Cir. 1962) 299 F.2d 625 [14 A.L.R.3d 1]; *People* v. *Mack* (1931) 115 Cal.App. 588, 590 [2 P.2d 209]; *Mintzer* v. *Wilson, supra,* 21 Cal.App.2d 85, 91-92; *People* v. *Tanner* (1946) 77 Cal.App.2d 181, 187 [175 P.2d 26]; *People* v. *Ortega* (1969) 2 Cal.App.3d 884, 893 [83 Cal.Rptr. 260]; Annot. (1967) 14 A.L.R.3d 16.)

I also reject the suggestion by the majority that appellant waived his right to call his expert as part of the defense case because he did not actually try to call him at that time. Once the trial court had implicitly ruled that by keeping the defense expert in the courtroom, appellant was foreclosed from later calling the expert as a witness, defense counsel was relieved of any further obligation to "make a record" by calling the witness. Counsel was entitled to rely on the earlier ruling by the trial court.

Nor can it be argued that appellant is precluded from asserting the Sixth Amendment error on appeal because he did not make a record as to what his expert would have testified. *People* v. *Duane* (1942) 21 Cal.2d 71, 81 [130 P.2d 123] holds that a formal offer of proof is unnecessary where the record shows the general substance of the precluded witness' testimony and that such testimony would be vital to the defense. Here, the record shows that appellant intended to call his expert to rebut the opinion testimony of Mr. Kyle, the prosecution expert, concerning the blood grouping and semen analysis and the percentages of the Caucasian and Mexican-American population having similar blood and semen types as appellant's found at the scene of the rape. As explained below, this testimony was vital to the defense.

Normally, the violation of a federal constitutional right in a criminal case requires a reversal. However, "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." (*Chapman* v. *California* (1966) 386 U.S. 18, 22 [17 L.Ed.2d 705, 709, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The deprivation of a criminal defendant's Sixth Amendment right to cross-examination as well as the right to call witnesses for the defense comes within the *Chapman* standard. (*United States* v. *Davis, supra,* 639 F.2d 239, 245; *Braswell* v. *Wainwright, supra,* 463 F.2d 1148; *People* v. *Jimenez* (1985) 171 Cal.App.3d 411 [217 Cal.Rptr. 324].)

I cannot find beyond a reasonable doubt that the trial court's error in precluding the defense expert in testifying was harmless. The prosecution

expert's testimony was confusing, disjointed and contradictory with reference to the blood grouping analysis. As argued by appellant, ". . . the prosecution's expert bandied around figures like a roulette wheel operator—6%; 15%; 11%; 27%." (Citations omitted.) The jury was obviously confused by this testimony; it interrupted its *deliberations* to ask about the percentages given by the prosecution's expert, but the trial court only reread the general instructions on expert testimony. Appellant's argument is persuasive: "In this light, it was crucial that appellant be allowed to present his expert witness to present evidence of the true proportion of the Mexican-American population with the blood-type found on the victim's bed which was also consistent with appellant's blood-type. Yet the court's order prevented appellant from presenting this critical witness on his behalf. The court had appointed only one expert, and it was too late in the trial for a second expert to be appointed and to testify. Thus, because of the prosecution's untimely motion to exclude witnesses, and the court's erroneous grant of the exclusion motion, appellant was deprived of his constitutional right to present a crucial expert witness on his behalf. Because the victim did not identify appellant, it is not certain beyond a reasonable doubt that the denial of appellant's constitutional right did not affect the verdict, and thus reversal is required (*Chapman v. California* (1967) 386 U.S. 18, 23). Even under a less strict standard for error, reversal is required. (See *Taylor v. United States* (9th Cir. 1967) 388 F.2d 786, 788-89; *United States v. Schaefer* (7th Cir. 1962) 299 F.2d 625, 631, *cert. denied,* 370 U.S. 917.)"

Trial and appellate judges should be extremely sensitive to defendants' Sixth Amendment right to call witnesses in their defense; this is the essence of our criminal justice system.

Finally, any doubt whether appellant should receive a new trial must be resolved in his favor when we consider the erroneous admission of his three prior felony convictions for burglary, assault with a deadly weapon and marijuana possession for impeachment purposes. If appellant had testified without impeachment by the prior convictions (as the majority acknowledges we must assume in assessing prejudice) and if he had been allowed to call his expert as a defense witness, it is reasonably probable the verdict would have been different even under the standard of *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]. The case against appellant was entirely circumstantial; the victim could not identify her assailant and could only describe him as "Mexican" and smelling of garlic. There was testimony that other workers in the garlic shed would have smelled of garlic.

While appellant's defense had some inconsistencies, it was not incredible; hence, when the jury heard appellant's extensive criminal record, including

the infliction of violence on others, appellant's credibility was destroyed just as emphasized by the prosecutor in his closing argument to the jury.

I would reverse the judgment of conviction and remand for a new trial.

Appellant's petition for review by the Supreme Court was denied May 8, 1986. Grodin, J., was of the opinion that the petition should be granted.